506 A.2d 872

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**John J. KELLER, Respondent.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1985.

Decided March 21, 1986.

574

---

Richard J. Orloski, Allentown, for respondent.

Albert M. Nichols, Chief Counsel, John W. Herron, Asst. Disciplinary Counsel-in-charge, Alan J. Davis, Asst. Disciplinary Counsel, Philadelphia, for petitioner.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

We are here called upon to consider the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania (hereinafter "Board") that Respondent, John J. Keller, be disbarred from the practice of law in the Commonwealth of Pennsylvania. The Board found, *inter alia,* violations of Disciplinary Rule 1–102(A)(3) (illegal conduct involving moral turpitude) and Disciplinary Rule 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation).[1] After hearing testimony in the matter, the Hearing Committee recommended the imposition of the sanction of disbarment. The Board, after review of the entire matter, adopted that recommendation and recommended further that Respondent be ordered to pay the cost of the investigation and prosecution of this matter. Pursuant to Pennsylvania Rule of Disciplinary Enforcement ("Pa.R.D. E.") 208(e) we are now called upon to determine the appropriate sanction, if any, to be imposed in this matter. For the following reasons we are constrained to conclude that the sanction of disbarment is appropriate and, therefore, accept the recommendation of the Board.[2]

The instant petition for discipline alleged professional misconduct with reference to two charges. Charge I relates to the Respondent's handling of the Estate of Mary Griffith. Charge II concerns Respondent's representation

---

1. Disciplinary Rule 1–102 of the Code of Professional Responsibility provides, in pertinent part:
   DR 1–102 MISCONDUCT
   (A) A lawyer shall not ...
   (3) Engage in illegal conduct involving moral turpitude
   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

2. Our jurisdiction derives from this Court's inherent and exclusive power to supervise the conduct of attorneys who are its officers. *See* Section 10(c) of Article V of the Constitution of Pennsylvania. *See also* Pa.R.D.E. 103, 201(a) and 208(e).

of Mr. and Mrs. James Molinaro with reference to the sale of their home. Hearings on the charges were held before a hearing committee and testimony was received on June 7, 1983, September 7, 1983, October 11, 1983, October 19, 1983 and December 8, 1983. Respondent was represented throughout by counsel. The report of the Hearing Committee was filed January 25, 1985 in which the Hearing Committee adopted sixty findings of fact proposed by the Petitioner and nine findings of fact proposed by the Respondent. The Hearing Committee concluded that Respondent violated ten disciplinary rules including DR 1–102(A)(3) and DR 1–102(A)(4). The Committee recommended to the Board that Respondent be disbarred.

Petitioner and Respondent subsequently filed briefs with the Disciplinary Board and oral arguments were heard before a three-member panel of that body. On May 21, 1985 the Board issued its report in which it adopted the findings of fact of the Hearing Committee, modified certain Conclusions of Law and concurred in the recommendation of disbarment. In its Conclusions of Law the Board, *inter alia,* affirmed the conclusion reached by the Hearing Committee that Respondent had violated Disciplinary Rules 1–102(A)(3) and 1–102(A)(4).[3] Briefs were filed by both parties in this Court and Respondent timely filed a request pursuant to Pa.R.D.E. 208(e)(2) requesting oral argument which was granted. The matter is now ripe for decision.

**3.** The Board also found violations of DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to him); DR 7–101(A)(1) (a lawyer shall not intentionally fail to seek the lawful objectives of his client); DR 7–101(A)(2) (a lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services); DR 7–101(A)(3) (a lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship); DR 9–102(A) (all funds of clients ... shall be deposited in one or more identifiable bank accounts ... and no funds belonging to the lawyer or law firm shall be deposited therein); DR 9–102(B)(3) (a lawyer shall maintain complete records concerning the real estate settlement funds that come into the possession of the lawyer and render appropriate accounts to his clients regarding them).

Charge I averred that Respondent had forged the endorsement on a check drawn on the account of an estate represented by Respondent and made payable to a Ms. Miriam Scheetz, a beneficiary of the estate in question. It is alleged that Respondent deposited that check with the forged endorsement in his trust account and thereafter converted those proceeds to his own use. Further, Respondent commingled his own funds with entrusted funds to make restitution from his trust account for the monies due to Miriam Scheetz. Finally, Respondent misrepresented to his client, the Administrator of the Estate, the cause for Ms. Scheetz's not having promptly received said monies.

Charge II averred that Respondent wrongfully withheld $10,400 from the proceeds of a real estate settlement. This amount was to be used for paying off the seller's mortgage, the payment of taxes and a water bill, and payment of a title insurance premium. Respondent deposited these funds in his trust account and subsequently converted them to his own use. Respondent neglected to pay those obligations for which the funds were being held in a timely fashion. Subsequently, he commingled his own funds with the remaining portion of the entrusted funds in order to pay the aforementioned obligations. Finally, Respondent failed to remit the title insurance premium to the title insurance company.

In response to these charges, Respondent attempts to frame an argument challenging the sufficiency of the testimony to support the Board's Conclusions of Law. This argument, as will be seen from our discussion, is a little more than a transparent makeway. The real defense in this matter is the contention that this misconduct would not have occurred but for the serious mental and emotional disfunction that Respondent was experiencing during the period of time in which this misconduct occurred. Respondent is in fact urging that the sanction of disbarment, in view of his emotional condition at the time, is too harsh a

result and has urged this Court to consider the imposition of a period of suspension.

To fully understand the thrust of Respondent's principle argument, it is necessary for us first to discuss the difference between suspension and disbarment. These are the two most severe types of discipline that this Court is empowered to impose for misconduct by a member of our bar.[4] Both of these punishments involve the withdrawal of the offending attorney's privilege to practice law before the courts of this Commonwealth. Suspension is the withdrawal of the privilege of practicing law for a specified period not to exceed five years. Disbarment requires the withdrawal of the privilege for at least five years. *See* Pa.R. D.E. 218(b).

However, the distinction between these two sanctions is more than a quantitative one. There is a qualitative difference between these sanctions. Although reinstatement is provided for in the case of suspension (exceeding three months) and disbarment, Pa.R.D.E. 218, the entitlement to reinstatement under the two sanctions is materially different. In the case of suspension the withdrawal of the privilege to practice law is for a specified period of time. After the expiration of that period a suspended attorney can resume the practice of law upon a demonstration of his or her fitness to practice. In contrast, where disbarment has been imposed, the length of the withdrawal of the privilege

---

**4.** Rule 204(a) of the Pennsylvania Rules of Disciplinary Enforcement provides:

Rule 204. Types of Discipline

(a) Misconduct shall be grounds for:

(1) Disbarment by the Supreme Court.

(2) Suspension by the Supreme Court for a period not exceeding five years.

(3) Public censure by the Supreme Court with or without probation.

(4) Probation by the Supreme Court under supervision provided by the Board.

(5) Private reprimand by the Board with or without probation.

(6) Private informal admonition by Disciplinary Counsel.

to practice law has not been previously determined. In disbarment the only expression as to the length of the withdrawal of the license to practice is that it must extend for a period of at least five years.

■ The primary purpose of our system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system. *See In re Oxman,* 496 Pa. 534, 437 A.2d 1169 (1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982); *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981); *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981). Disciplinary procedures have been established as a catharsis for the profession and a prophylactic for the public. *Office of Disciplinary Counsel v. Lewis, supra* 493 Pa. at 528, 426 A.2d at 1142. In the case of disbarment there is no basis for an expectation by the disbarred attorney of the right to resume practice at some future point in time. When reinstatement is sought by the disbarred attorney, the threshhold question must be whether the magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon "the integrity and standing of the bar or the administration of justice nor subversive of the public interest." Pa.R.D.E. 218(c)(3)(i).[5] It is because of this very real distinction between suspension and disbarment that Respondent here urges a sanction of suspension, even for the maximum period, rather than disbarment.

■ Before analyzing the testimony offered in support of the charges it must be noted that this Court's review of attorney discipline is a *de novo* one. Thus, we are not bound by the findings of either the Hearing Committee or the Disciplinary Board. *Matter of Green,* 470 Pa. 164, 368

---

**5.** This added inquiry would be improper in the case of a suspension since the initial order sets forth the period of time necessary to satisfy the breach of trust occasioned by the conduct which led to the suspension.

A.2d 245, (1977); *Office of Disciplinary Counsel v. Walker*, 469 Pa. 432, 366 A.2d 563 (1976); *Office of Disciplinary Council v. Campbell*, 463 Pa. 472, 345 A.2d 616 (1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976). Although we are free to evaluate the evidence presented before the Hearing Committee, *In re Silverberg*, 459 Pa. 107, 327 A.2d 106 (1974), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982), we may be enlightened by the decisions of these triers of fact who had the opportunity to observe the demeanor of the witnesses during their testimony. *Matter of Green, supra; Office of Disciplinary Council v. Walker, supra; Office of Disciplinary Counsel v. Campbell, supra.* The evidence is sufficient to prove ethical misconduct if a preponderance of that evidence establishes the charged violation and the proof is clear and satisfactory. *Office of Disciplinary Counsel v. Kissel*, 497 Pa. 467, 442 A.2d 217 (1982); *In re Berlant*, 458 Pa. 439, 328 A.2d 471 (1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975). Nor is the petitioner required to establish the misconduct through direct evidence. The ethical violations may be proven solely by circumstantial evidence. *Office of Disciplinary Counsel v. Grigsby, supra; Lemisch's Case*, 321 Pa. 110, 184 A. 72 (1936); *Salus's Case*, 321 Pa. 106, 184 A. 70 (1936).

Under Charge I evidence was introduced to establish that Mary Griffith died on September 12, 1980 and appellant was hired to represent the estate. The heirs agreed amongst themselves to provide an equal share of the estate to Miriam Scheetz, the widow of a nephew of decedent. An estate check in the amount of Eight Thousand, One Hundred and Fifty-six Dollars and Ninety-three Cents ($8,156.93) made payable to the order of Miriam Scheetz, representing her one-third share, was entrusted on February 5, 1982 to Respondent for presentation to Ms. Scheetz. It was uncontradicted that Ms. Scheetz never received this check and that she did not sign the reverse side of the check

where her purported endorsement appeared. Moreover, Ms. Scheetz testified she did not give Respondent or any other person the authority to endorse this check.

This check was deposited into Respondent's trust account on February 9, 1982. Respondent's stamped endorsement was placed below the purported endorsement of Ms. Scheetz. At the time of this deposit, Respondent's trust account had a balance of One Dollar and Eighty-seven Cents ($1.87). After this deposit, Respondent used the funds in this account for his own purposes.[6] Evidence was introduced that Respondent stated to his secretary at that time that the money due Ms. Scheetz was no longer in the estate account and that he "needed" that money. He also advised Ms. Aaron, his secretary at the time, "if anything happened that he went before the Disciplinary Board, the witnesses would have to look him in the face and that he would make trouble."

When inquiry was made regarding the delivery of the check to Ms. Scheetz, Respondent used deception to cover his misconduct. After being threatened with a complaint to the Disciplinary Board, Respondent finally met with Ms. Scheetz on March 19, 1982, and presented her with a check in the full amount drawn from his trust account and not the estate account. At that time he requested that she wait a period of time before attempting to negotiate the check. The funds were obtained from legal fees in other matters and personal loans which he deposited into his trust account.

With respect to Charge II, the following facts provide the basis for the allegations against the Respondent. On August 7, 1981, Mr. and Mrs. James Molinaro sold their home to Mr. and Mrs. Michael Nimeh. Respondent was the settlement agent and agreed to represent both parties at the real estate transaction.

---

**6.** Upon depositing the estate check, Respondent drew a One Hundred Dollar check against it thereby causing the account to be out of trust.

The total settlement funds, amounting to $67,299.22 were deposited into Respondent's trust account on August 10, 1981. From the settlement funds, Respondent was entrusted with approximately $10,400 to pay off the Molinaro's mortgage, to pay off county, township and school taxes, to pay off a water bill, and to pay the title insurance premium. After the aforesaid settlement funds were deposited into Respondent's trust account, Respondent proceeded to convert the $10,400 to his own use without the knowledge, consent or permission of Mr. and Mrs. Molinaro or the title insurance company.

By late August, 1981, the balance in Respondent's account, which should have contained approximately $10,400 to pay off the aforesaid debts, contained only about $7,000. By the end of September, 1981, the balance was down to approximately $3,000 and by early November, 1981, the balance in the trust account was less than $100. On November 6, 1981, the trust account had a negative balance of almost $3,000.

When James Molinaro received notices from Prudential that his mortgage payments had fallen behind, he attempted to contact Respondent, but without success. Although the real estate settlement was held in August, 1981, the Molinaro's mortgage was not paid off until November 11, 1981. Respondent obtained sufficient funds to pay the Molinaro mortgage only by commingling a large legal fee received in connection with another matter into his trust account.

By letter dated February 15, 1982, James Molinaro was advised by Whitehall Township that the county, township and real estate taxes had not been paid. Again Mr. Molinaro attempted to telephone Respondent on several occasions but he was unable to speak with Respondent. In February, 1982, James Molinaro filed a complaint with the Bar Association against the Respondent. The real estate taxes were finally paid on May 11, 1982. Respondent has yet to

forward to the Title Company the premium amount he collected at settlement.

Both the Hearing Committee and the Board found that prior to the period encompassing the charges Respondent was an active and competent member of the bar; that Respondent and his brother conducted a real estate and title insurance agency; and that the relationship between the brothers was dissolved following a period of frequent acrimonious disputes. As a result of this breakup, Respondent's mental and emotional well-being was substantially impaired and thereafter he began exhibiting irrational behavior daily, continuing throughout the period encompassing the charges against him. Additionally, Respondent's witness, Dr. John C. Turoczi, a psychologist who had treated him for over a two-year period, testified that Respondent's emotional condition at the time the violations occurred was such that he was delusionary, irrational, and not responsible for his errant behavior.[7]

Appellant argues that because of his state of mind he should not be held accountable for his derelictions. With all due respect to the views of Respondent's medical witness, the record amply supplies evidence of Respondent's aware-

7. At one point in Dr. Turoczi's testimony the following transpired:
"Q. Would his overall mental condition have prevented him from balancing a checkbook or conducting normal, everyday financial affairs?
A. In my opinion, it would have had negative effect on his ability to do that, yes.
Q. When you say negative effect, you mean it would absolutely prevent him or just make it more of a mental strain to do so?
A. It would have made more of a mental strain and would have contributed to errors simply in terms of judgment, simply in terms of decimal points, in terms of what pages to put what numbers, and identify just the structure of—this is the date, this is to whom the check was written and so forth and so on. The reason I can say this is because Mr. Keller had difficulty filling out a check at my office to me, and this was a pattern. So I could see it on various occasions, and if he had difficulty doing that with me, one of my hypotheses was that he certainly had a lot of difficulty doing that with any other people."

ness of the consequences of his behavior. It is clear that he was aware that the estate check entrusted to him was the property of Ms. Scheetz and that he had no personal interest in it. When he used these funds his comments to Ms. Aaron reflect his awareness of guilt. The misrepresentations made to excuse his delay in turning the funds over further evidence a deliberative quality which would justify a finding of accountability for this conduct. The same awareness is reflected in the Molinaro's matter. In this instance there was no question that Respondent merely held this money as stake holder without any personal interest in that fund. He placed it in his trust account and allowed these funds to be disipated to the detriment of those individuals entitled to these monies. There is no suggestion of a delusion that would have caused Respondent not to be aware of his responsibility in this regard. If in fact this was a result of the irrational behavior ascribed to Respondent by his medical expert, Respondent's response when a complaint was filed would appear to attest to the theraputic effect of the disciplinary process, which would be lost if we were to accept Respondent's contention that he should be held blameless for these derelictions.

The real question raised in this case is whether the sanction of disbarment is too harsh under the circumstances presented. If we were here primarily concerned with a punishment of the individual, strong argument could be made in view of the circumstances surrounding the errant behavior. We sympathize with the situation that confronted Respondent and concede that if judgment of him alone was the sole consideration extenuating circumstances could be persuasively argued. However, as we previously noted, the focus is not upon Respondent but rather it is directed to the impact of his conduct upon the system and its effect on the perception of that system by the society it serves.

Here we are confronted with a forgery [8], the conversion and commingling of entrusted funds, the use of misrepresentation in an effort to avoid detection, and, the adverse effect upon the interests of his clients caused by his behavior. These serious breaches of trust cannot be ignored because of the mitigating circumstances offered by Respondent in his defense. It is to Respondent's credit that he recognized that he was in trouble and sought professional help. However, he also had the responsibility to protect his clients' interests during this period, such as associating with another counsel who could assist in the handling of these matters. The heart of the attorney-client relationship is trust and confidence. This cannot exist where the integrity of counsel is suspect. If conduct of the nature engaged in by Respondent in this matter is not immediately responded to by our disciplinary process, we cannot hope to engender the public perception of confidence in our system.

Unfortunately for Respondent the imposition of a period of suspension, even for a period of five years, would be an inadequate response. A similar situation was confronted by this Court in *Office of Disciplinary Counsel v. Herrmann,* 475 Pa. 560, 381 A.2d 138 (1977). The attorney in *Herrmann* was charged with serious violations of our Disciplinary Code in his handling of two estate matters. He sought to be allowed to resign from active practice with the stipulation that he would never apply for reinstatement.[9]

**8.** Respondent attempts to argue that the proof necessary to establish the criminal offense of forgery has not been made out in view of his mental condition. Without considering the point as to whether the crime of forgery could be sustained on the evidence here presented, Ms. Scheetz's check was entrusted to Respondent for delivery to her. Instead, it was diverted to Respondent's use, and that end was facilitated by someone forging her signature to accomplish that result. If indeed Respondent was not responsible for the forgery, he permitted it to be used for his purposes in breach of the trust relationship that existed.

**9.** The basis for the request was that Herrmann was 76 years of age, had practiced law 49 years, and had served as President and on various committees of the Bar Association in the county of his

We rejected his request and entered an order of disbarment noting:

> Rule 215 of the Rules of Disciplinary Enforcement permits an attorney who is the subject of an investigation into allegations of misconduct to submit his resignation as an attorney, providing, inter alia, he acknowledges that the material facts upon which the complaint is predicated are true and he agrees that an order of disbarment by consent may be entered. Respondent will not agree to this. Instead, he seeks to avoid embarrassment and any stigma of culpability by quietly retiring from the active practice of the law as attorneys frequently do for personal reasons after an honorable practice. To permit the respondent to escape proper discipline under the facts of this case would be a very unwise precedent. It would also constitute an act of irresponsibility on our part and a great disservice to the public which is entitled to the protection of the courts from attorneys who disregard and violate their professional responsibility.

*Id.*, 475 Pa. at 563, 381 A.2d at 140.

The practical effect of the request of the attorney in *Herrmann* would have been his permanent removal as an active member of our bar. While disbarment could do no more, we recognized therein that the public interest required the entry of the order of disbarment and its attendant stigma to a previously unblemished reputation. Our decision in *Herrmann* was not motivated by a desire to exact punishment from the attorney but rather to assure the public of the system's awareness of the seriousness of a breach of trust by an attorney licensed to practice before our bar.

■ Disbarment is an extreme sanction which must be imposed only in the most egregious cases, *Office of Disciplinary Counsel v. Kissel, supra; Matter of Leopold,* 469

residence as well as serving on several citizens committees advancing local civic projects.

Pa. 384, 366 A.2d 227 (1976), because it represents a termination of the license to practice law without a promise of its restoration at any future time. It has been deemed appropriate where the misconduct involves the types of breach of trust exhibited in this case. As noted in *Johnson Disbarment Case*, 421 Pa. 342, 219 A.2d 593 (1966):

> It is the duty of the courts to maintain the integrity of the Bar and to see that courts and its members "do not fall into disrepute with the general public through the unprofessional or fraudulent conduct" of attorneys (*Forman's Case*, 321 Pa. 47, 184 A. 75). "The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement...."

*Johnson Disbarment Case, supra* 421 Pa. at 345–46, 219 A.2d at 595 (citation omitted).

■ Where an attorney converts and commingles entrusted funds, accomplishes this breach of trust by the use of forged documents, and employs misrepresentations to mask this covert activity, the magnitude of the derelictions and its impact upon the legal profession and the administration of justice requires the imposition of the most severe sanction at our command. *See e.g., Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983) (converting and commingling client funds with personal funds warrants disbarment); *Office of Disciplinary Counsel v. Kissel, supra* (forging client's name on check and converting proceeds to personal use warrants disbarment); *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982) (neglecting legal matters, converting client funds, making dishonest statements to clients warrants disbar-

ment); *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981) (commingling of entrusted funds with personal funds and material misrepresentations warrants disbarment); *Office of Disciplinary Counsel v. Lewis, supra,* (commingling and converting of client funds, misrepresenting that certain expenses had been paid warrants disbarment).

We accept the recommendation of the Disciplinary Board and the Respondent is herewith disbarred from the practice of law in any court subject to our supervision. Further, Respondent is ordered to pay the costs of investigation and prosecution in this matter.