## In re Anonymous No. 45 D.B. 84

Disciplinary Board Docket No. 45 D.B. 84.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

KELLER, *Member,* April 3, 1992—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for reinstatement.

### HISTORY OF PROCEEDINGS

On April 14, 1986, petitioner was disbarred from the Pennsylvania bar pursuant to Supreme Court order. Petitioner's disbarment was pursuant to his February 14, 1984, conviction for possession, with intent to distribute cocaine, in violation of 21 U.S.C. §§846 and 841(a)(1).

On April 8, 1991, petitioner filed a reinstatement petition and questionnaire.

The matter was referred to Hearing Committee [    ], which was chaired by [    ], Esquire, and included [    ], Esquire.

On July 15, 1991, a hearing was held on the matter.

The Hearing Committee filed its report on the matter on September 12, 1991, and recommended that the petition for reinstatement be granted.

The Office of Disciplinary Counsel did not file a brief on exceptions.

The matter was adjudicated at the December 12, 1991, meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## FINDINGS OF FACT

The following findings of fact are based upon the documentary and testamentary evidence presented before the initial Hearing Committee and Disciplinary Board in 1985.

(1) The petitioner, [    ], was born on May 21, 1948, was admitted to practice law in the Commonwealth of Pennsylvania on or about November 26, 1973, and, prior to his interim suspension, maintained his office for the private practice of law at [    ]. As of the time of the hearing, the respondent has been married to [A] for six and one-half years and they reside at [    ] in the city of [    ]. He attended the University of [    ] for his undergraduate degree and obtained his law degree from the University of [    ] in 1973. Apparently prior to graduation from law school, the petitioner was special legal counsel to the [    ] program of the Department of Community Affairs, Commonwealth of Pennsylvania. For approximately five years ending in 1976, the petitioner

was employed as counsel for the Pennsylvania Labor Relations Board, Department of Labor and Industry.

(2) In 1976, the petitioner began a private practice in partnership with [B] ([B] is identified at N.T. 57) with whom he practiced until about January 1, 1982. In September or October 1981, the petitioner started "catching [his] partner in lies more and more" and hired a bookkeeper who advised, "[petitioner], he is stealing from you." (N.T. 35-37). Thereafter, the petitioner severed his partnership with [B] and opened his own office at [    ] where he engaged in a small general practice until the time of his interim suspension. While out on his own, the petitioner estimated he earned between $35,000 and $40,000. About a year after the petitioner and [B] split up, [B] was disbarred on consent. The petitioner was not implicated in any of [B's] professional misconduct.

(3) In or about that general period of time, the petitioner's father, who was also an attorney, became seriously ill leaving the petitioner, as the eldest son, the head of the family. The petitioner's youngest brother and sister are also attorneys. Additionally, respondent's first cousin, who was raised by petitioner's family, had a complete mental breakdown and the petitioner's wife was laid off from her state job. A business venture which the petitioner and his wife had entered into with another couple "turned into a nightmare" and "was devastating" to petitioner's wife causing marital problems. (N.T. 37).

(4) According to the petitioner, in the winter of 1981-1982, he "was looking for an escape from the situation." (N.T. 38). During that period of time, the petitioner started frequenting a business establishment of [C], whom the petitioner had represented. The petitioner described [C]

as a "very immoral" individual who came from a wealthy family and was very intelligent. (N.T. 39). [C] had told petitioner that he had sold drugs since he was a little kid; that he used to steal his father's medical drugs and sell them to kids in high school. The petitioner also indicated that [C] "lied all the time" (N.T. 68) and had "connived" his father "into paying like $100,000 to get him out of debt." (N.T. 54).

(5) In or about May of 1982, according to the indictment or in "April or March" of 1982, according to the petitioner (N.T. 53), [C] approached the petitioner and said: "I've got a chance to get some real good cocaine. Do you know anybody who could buy a significant quantity of it?" The petitioner replied he would call somebody. The petitioner contacted a good friend of his, [D], who the petitioner knew was quite wealthy and used cocaine and may even have previously asked the petitioner to let him know if the petitioner ever heard of someone wanting to sell cocaine. The petitioner's friend agreed to purchase four ounces of high quality cocaine for $7,800 or $8,000 (N.T. 40, 57, 65) and asked the petitioner to go along on the buy to "watch his money." (N.T. 40). Respondent's friend came to the petitioner's house and gave petitioner the $8,000, scales and a testing kit, known as a "hot box." (N.T. 40, 42). [C] picked the petitioner up and they drove to somewhere in [    ] or northern [    ] County where they met a man named [E]. [C] gave [E] the money, [E] went and got the cocaine and returned with it. The cocaine was weighed on the scales and tested on the "hot box" as the petitioner read the directions. (N.T. 42-43). The petitioner even physically tested the cocaine by rubbing some on his gum. He might even have snorted some. During the petitioner's

direct testimony, he indicated that after the cocaine was tested [C] drove the petitioner immediately home. However, during cross-examination, the petitioner added that [C] cut one-half ounce out of the four ounces and made up the difference with some form of a cutting agent. The petitioner knew that [C] intended to sell this half ounce to make a profit on the transaction. Upon the petitioner's return home, he called his friend and then delivered the cocaine to him at some shopping center. The petitioner received no money or anything of value as a result of his involvement in this transaction but engaged himself in this knowingly criminal activity: because he wanted to help his friends; because of the intrigue; for an escape; and to see if he had to guts to do something inherently dangerous.

(6) The petitioner testified he never did anything like this either before or after this incident even though about six months after this incident, his friend asked him to arrange another purchase. The petitioner refused but, according to petitioner's wife, the petitioner felt "guilty" in refusing to again engage in criminal activity. (N.T. 99). The petitioner, up until the time the F.B.I. contacted him in October of 1983, "had a casual recreational use of marijuana" which went back to his college days. (N.T. 63). The petitioner even used cocaine about five times.

(7) The petitioner discovered the F.B.I. wase investigating this incident on October 4, 1983, when he was visited in his law office by two F.B.I. agents and questioned about the transaction. While the petitioner admitted his own involvement in the transaction to the F.B.I., he refused to reveal the identity of his friend. The very next day, on October 5, 1983, the petitioner saw Assistant U.S.

Attorney [F], with whom the petitioner had grown up in [ ], on the street and told [F] of the incident—again with the exception of the name of petitioner's friend.

(8) On November 23, 1983, an indictment by the Grand Jury was filed against petitioner in the U.S. District Court for the [ ] District of Pennsylvania at CR-[ ] wherein the petitioner was charged with one count of knowingly conspiring to unlawfully import, distribute and possess with intent to distribute four ounces of cocaine, a Schedule II narcotic controlled substance, contrary to the provisions of 21 U.S.C. §841(a)(1), in violation of 21 U.S.C. §846 and with one count of knowingly, intentionally and unlawfully possessing, with intent to distribute four ounces of cocaine in violation of 21 U.S.C. §841(a)(1). Both charges are felonies and punishable by imprisonment for up to 15 years and fines of up to $25,000.

(9) On December 21, 1983, the petitioner appeared with counsel, [G], for arraignment and entered a plea of not guilty to the indictment and requested a jury trial. The petitioner testified he did not plead guilty because the prosecution "never offered any concrete benefit" to him. (N.T. 48). The petitioner was willing to give the government the name of his friend and to plead guilty to a simple possession charge. However, the government did not accept the petitioner's offer.

(10) The petitioner's jury trial commenced on February 13, 1984, in the U.S. District Court for the [ ] District of Pennsylvania and on February 14, 1984, the jury returned verdicts of guilty on both counts. The petitioner did not testify during his criminal trial. On February 24, 1984, the petitioner filed post-trial motions for a new

trial and in arrest of judgment but he voluntarily withdrew them on March 23, 1984.

(11) On March 20, 1984, the Honorable [H], U.S. district judge, sentenced the petitioner to a three-month period of imprisonment and to pay a fine of $1,000 for Count I. For Count II, the petitioner was sentenced to a two-year term of imprisonment which sentence was suspended and the petitioner placed on probation for two years commencing upon the petitioner's release from confinement on Count I. The period of probation was subject to a special condition of the performance of 200 hours of community service work.

(12) By order dated March 27, 1984, Judge [H] suspended the petitioner from practice before the U.S. District Court for the [    ] District of Pennsylvania pursuant to Local Rule 301.1.

(13) Having been convicted, the petitioner could be compelled to testify before the federal grand jury and did so under subpoena on two occasions. The petitioner paid the $1,000 fine and began serving his three months in [    ] Prison on or about April 9, 1984. The petitioner served a total of 81 days in jail but was on work release for 5 1/2 days each week. According to Office of Disciplinary Counsel's calculations, petitioner was released from jail on or about June 28 or 29, 1984.

The following findings of fact are based upon the documentary and testamentary evidence presented before the current Hearing Committee:

(14) Petitioner admits that no dispute exists as to underlying factual circumstances which gave rise to the petition for discipline.

(15) Several members of the bar proffered non-controverted testimony about petitioner's excellent moral character and integrity at the hearing before Committee [    ]. All of those who appeared before the Hearing Committee further testified that petitioner's misconduct was an aberration, and that he had subsequently matured during the period of his disbarment.

(16) Petitioner's psychiatrist, Dr. [I], testified that at the time petitioner engaged in the conduct for which he was disbarred, he was being treated for acute situational disturbance, a type of reaction to multiple "stresses" present in his life. Dr. [I] also stated that he believed petitioner's "insight is complete in every way ... the probability of him again acting inappropriately is virtually non-existent." (N.T. 134).

(17) In addition to the testimony offered to the Hearing Committee, petitioner also presented letters from lay persons and attorneys attesting to his favorable moral character.

## CONCLUSIONS OF LAW

(1) The misconduct which resulted in petitioner's disbarment is not so egregious as to preclude immediate consideration of his petition for reinstatement.

(2) Petitioner has proved that he possesses the moral qualifications, competency and learning in the law required of an attorney licensed to practice law in the Commonwealth of Pennsylvania.

(3) Petitioner's resumption of the practice of law will not compromise the integrity of the bar nor subvert the interests of the public.

## DISCUSSION

The issue in the instant proceeding is whether the petition for reinstatement should be granted. The determination of whether petitioner should be permitted to resume the practice of law in Pennsylvania requires an examination of the underlying misconduct, consideration of the type of rehabilitation undertaken by petitioner during the period of disbarment, and analysis of petitioner's moral qualifications and learning in the law.

The Disciplinary Board must first decide whether the misconduct which led to disbarment is so egregious as to preclude reinstatement. "(A) review of the underlying offense is required as an initial step in determining eligibility for reinstatement." *Office of Disciplinary Counsel v. [J]*, 4 D.B. 76 at (4). *[J]* recognizes that there are certain acts of misconduct which are so repugnant to the integrity of the bar and the interests of the public that no passage of time or rehabilitation can compensate for the travesty which would result if the petitioner was restored to the bar.

The query in this case is whether petitioner's 1984 conviction for possession and intentional distribution of cocaine, in violation of federal law, is so patently offensive as to preclude his possible reinstatement to the bar eight years later. An examination of relevant Pennsylvania disciplinary case law and consideration of the facts surrounding the misconduct will prove helpful in answering this question.

Although attorney misconduct in Pennsylvania is recognized as a serious problem warranting severe disciplinary action, disbarment does not necessarily mean permanent exclusion from the bar. See *Office of Disci-*

*plinary Counsel v. [K]*, 26 D.B. 81 (petitioner readmitted to the bar after delivering a bribe to a public official, offering false testimony under oath after a grant of immunity, failing to make appropriate disclosure to a federal grand jury and law enforcement officers, and "laundering" checks for a public official): *In re [L]*, 49 D.&C.3d 298 (1988) (attorney reinstated after numerous convictions for offering materially untrue statements to the Office of Housing and Urban Development, fraudulent lot sales and mail fraud). In both of these cases, the petitioning attorney was once again entrusted with the role of an officer of the court despite prior conduct which repudiated respect for the legal system.

[K], like petitioner, was a young attorney whose naivete contributed to, although did not excuse, his misconduct. The Hearing Committee heard lengthy testimony about petitioner's naive, trusting attitude at the time of his misconduct. Although an attorney's immaturity in no way mitigates his professional misconduct, it is explanatory in regard to the aberrational nature of his actions. In the instant case, petitioner's naivete is also illuminating about why he would participate in a drug transaction in which he did not profit in order to help a friend. The isolated nature of petitioner's conduct makes it apparent that his foray into illegal activity was a fluke which will not recur. Although we recognize the gravity of his offense, we conclude that, in light of all of the aforementioned factors, it is not so egregious as to preclude immediate consideration of the prayer for reinstatement.

The next questions before the board relate to petitioner's activities during the period of his disbarment. The preliminary issue is whether a sufficient quantitative period of time has elapsed since petitioner's misconduct during

which he had engaged in qualitative rehabilitation. *Office of Disciplinary Counsel v. [M]*, Nos. 4 and 35 D.B. 79 (attorney who voluntarily resigned from the bar after unsatisfactory handling of client affairs and later reinstated). The next issue is whether a sufficient quantitative period of time has elapsed since petitioner's misconduct during which he has engaged in qualitative rehabilitation. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986); *Office of Disciplinary Counsel v. [M]*, Nos. 4 and 35 D.B. 79. Has petitioner been qualitatively rehabilitated from the conduct which resulted in his disbarment?

Since his 1984 conviction for the conduct which led to his disbarment, petitioner has served his prison term, paid a court-imposed fine, performed extensive community service work, and received psychiatric help for the acute situational disturbance which plagued him at the time of his misconduct. Additionally, several of the witnesses who appeared before the Hearing Committee testified that petitioner has matured a lot in the past eight years. We are satisfied that all of these facts demonstrate that petitioner has engaged in a qualitative rehabilitation during the period of his disbarment, and therefore complied with the *Keller* standard.

The final phase of analysis of the petition for reinstatement involves the requirements outlined in Rule 203, Pa.R.D.E., namely that petitioner demonstrate moral qualification, adequate learning in the law, and that his reinstatement would not be detrimental to the bar or the public. It is incumbent upon petitioner to prove the aforementioned factors by the use of clear and convincing evidence.

The above mentioned [*L*] and [*M*] cases are two instances in which the petitioner sustained the burden of proving moral qualification to resume the practice of law through the presentation of favorable character testimony by respected members of the bar.

Similarly, petitioner presented testamentary and documentary evidence from members of the bar and the community, who attested to his integrity and moral fiber. Witnesses who appeared before the Hearing Committee included the [    ] of the Pennsylvania Trial Lawyers Association, and numerous other members of the bar. We are convinced that his testimony, coupled with petitioner's psychiatrist's statement that the chances of petitioner's repetition of his misconduct is "virtually non-existent," illustrates petitioner's moral qualification to practice law.

Additionally, petitioner has satisfactorily demonstrated that he possesses the requisite learning in the law expected of a Pennsylvania practitioner. Petitioner has engaged in lengthy legal discussion with his sibling lawyers, read the advance sheets, and attended the Pennsylvania Bar Institute Legal Practice Course.

Finally, we note that the Office of Disciplinary Counsel did not file exceptions to the recommendation that petitioner be reinstated, and that no evidence was presented to either the Hearing Committee or the Disciplinary Board which would controvert our findings. We therefore conclude that petitioner's reinstatement will not prove detrimental to the integrity of the bar nor subversive of the interests of the public.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that the petition for

reinstatement of [petitioner] to practice law in the Commonwealth of Pennsylvania be granted.

The board further recommends that, pursuant to Rule 218(e), Pa.R.D.E., petitioner be directed to pay the necessary expenses incurred in investigating and processing of said petition for reinstatement.

Ms. Flaherty and Mr. Leonard did not participate in the adjudication.

## ORDER

And now, April 3, 1992, upon consideration of the report and recommendations of the Disciplinary Board dated March 17, 1992, the petition for reinstatement is granted.

Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.