**In re Anonymous No. 6 D.B. 83**

Disciplinary Board Docket no. 6 D.B. 83.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

WATSON CARSON, *Member,* April 20, 1994—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for reinstatement.

## I. HISTORY OF PROCEEDINGS

The Office of Disciplinary Counsel filed a petition for discipline on February 11, 1983. The two charges averred that petitioner commingled and converted client funds in his trust account and misrepresented these facts to his clients and third parties.

The Disciplinary Board agreed with the Hearing Committee and concluded that respondent's conduct warranted disbarment for violation of Disciplinary Rules 1-102(A)(3) and (4). In a notable opinion, the Pennsylvania Supreme Court concurred, and petitioner was thereafter disbarred by order of March 21, 1986.

On August 10, 1992, a petition for reinstatement was filed, and an appearance entered on behalf of petitioner by [A], Esq. On August 19, 1992, the matter was referred to Hearing Committee [    ], chaired by [    ], Esq. and included [    ], Esq. and [    ], Esq.

The reinstatement hearing was held on December 23, 1992 and continued on February 10, 1993. On August 6, 1993 the Hearing Committee filed its report and recommended that reinstatement be granted. The Office of Disciplinary Counsel did not file exceptions to the report of the Hearing Committee.

The matter was adjudicated at a meeting of the Disciplinary Board held on October 15, 1993.

## II. FINDINGS OF FACT

(1) Petitioner was born in 1945 and was admitted to the Pennsylvania Bar in November 1971. He was a sole practitioner from the time of his admission to the bar until the summer of 1983.

(2) From the period beginning August 10, 1981 and ending approximately March 19, 1982, petitioner commingled and converted client funds in his trust account for his own uses and purposes.

(3) Specifically, petitioner forged the endorsement on a check in the amount of $8,156.93, payable to [B] and drawn on the account of an estate represented by respondent. (Reinstatement questionnaire at 5.)

(4) In addition, respondent converted $10,400 from the proceeds of a real estate settlement with Mr. and Mrs. [C], to whom he acted as the real estate agent. The amount had been withheld for payment of expenses incurred with the sale of the property. (Reinstatement questionnaire at 5.)

(5) Respondent has reimbursed all persons and institutions who suffered financial loss by reason of his misconduct.

(6) Prior to petitioner's misconduct, he submitted to the care of a psychiatrist for psychological difficulties which he was experiencing.

(7) Petitioner terminated this treatment upon learning of the psychiatrist's intimate relationship with petitioner's girlfriend.

(8) Petitioner subsequently retained Dr. [D], a psychologist, and was tested in 1980. The results showed that petitioner suffered from psychotic depression, accompanied by delusions, marked suicidal ideation, marked anxiety, agitation, and rage reactions. (N.T. 230.)

(9) The petition for discipline was filed on February 11, 1983.

(10) In the late spring of 1983, petitioner closed his law practice and moved to Washington, D.C. where he obtained a position as a lobbyist until approximately February 1985. (N.T. 27.)

(11) In or around May 1985, petitioner moved to Phoenix, Arizona, where he held the positions of instructor and course writer for the [E] of Paralegal Studies and the [F] Institute. He taught paralegal courses in 10 different subject areas. (N.T. 33-35.)

(12) Petitioner was disbarred by order of the Pennsylvania Supreme Court dated March 21, 1986.

(13) Petitioner returned to [     ], Pennsylvania in the fall of 1989 to work as a full-time paralegal-researcher for Attorney [G]. He held this position until January 1991. (N.T. 35, 39.)

(14) From March 1991 to the present, petitioner has been employed by the law offices of [A] as a paralegal-researcher. (N.T. 41.)

(15) Petitioner also performed legal research and paralegal work as an independent contractor for a number of [     ] area attorneys. (N.T. 45.)

(16) Petitioner completed the Pennsylvania Bar Institute's basic practice course at [     ] University on August 9, 1991. In addition, he attended five other PBI courses in diverse areas of the law between January

18, 1991 and October 29, 1992. (Attach. reinstatement questionnaire 13-14.)

(17) Petitioner was re-evaluated by Dr. [D] on November 11, 1992 and was pronounced asymptomatic from the mental disorders from which he suffered in the 1980s. (N.T. 230, 232.)

(18) Petitioner routinely reads 13 legal periodicals. He has also read 34 treatises on the law, including paralegal services, law office administration, and law office periodicals. Since his return to [    ], petitioner has completed research papers in diverse areas of the law. (Attach. reinstatement questionnaire 9-18.)

(19) Since petitioner's disbarment, his activities have not constituted the unauthorized practice of law, nor is he engaged in other activities which could be construed as being the unauthorized practice of law.

(20) Since petitioner's return to [    ], he has been actively engaged in community affairs and has performed paralegal services in the community without charge.

(21) Petitioner presented a large number of witnesses at his reinstatement hearing. Among them was the mayor of [    ], as well as 17 attorneys engaged in public and private practice in that area. All endorsed his petition for reinstatement and testified as to petitioner's integrity and reputation in the community, as well as his exceptional legal skills.

## III. CONCLUSIONS OF LAW

The misconduct for which petitioner was disbarred is not so egregious as to preclude immediate consideration of his petition for reinstatement.

Petitioner has demonstrated, with clear and convincing evidence, that he possesses the moral qualifications, competency and learning in the law necessary to practice law in the Commonwealth of Pennsylvania.

Petitioner's resumption of the practice of law will not be detrimental to the integrity of the bar nor subversive of the interests of the public.

## IV. DISCUSSION

Ironically, this petitioner's request for reinstatement to the bar is governed, in part, by the Pennsylvania Supreme Court opinion [ ]. See *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). The *Keller* opinion articulates a threshold which must be met before the requisites of Pa.R.D.E. 218(c)(3)(i), the disciplinary rule regulating resumption of practice after disbarment, are parsed.[1]

The preliminary de novo inquiry mandated by *Keller* is whether the "magnitude of the breach of trust would permit the resumption of practice without a detrimental effect upon the 'integrity and standing of the bar or the administration of justice nor subversive of the public interest.'" *Id.* at 579, 506 A.2d at 875. *Keller* thus requires a precursor determination that the original misconduct

---

1. The rule reads as follows:

"A disbarred or suspended attorney shall have the burden of demonstrating by clear and convincing evidence that such person has the moral qualifications, competency in learning and law required for admission to practice law in this Commonwealth and that the resumption of the practice of law within the Commonwealth by such person will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive to the public interest." Pa.R.D.E. 218(c)(3)(i).

was not so patently offensive as to preclude readmission. *In re Anonymous No. 4 D.B. 76,* 45 D.&C.3d 111 (1986). In other words, it must be established that "the taint of the violation has been dissipated," to the extent "that there will be no detrimental effect from the initial violation if practice is resumed." *In re Anonymous No. 46 D.B. 75,* 50 D.&C.3d 170, 179 (1987). Only when this preliminary step is hurdled do we query whether the requirements of Rule 218(c)(3)(i) are satisfied.

Two charges formed the basis of the petitioner's original disbarment. In the first instance of misconduct, petitioner was hired to represent an estate. The heirs had agreed to provide an equal share of the estate to a [B], the widow of a niece of decedent. An estate check made payable to [B] was entrusted to petitioner for presentation to [B]; however, [B] did not receive the check nor did she endorse it. Nonetheless, the check with a forged endorsement was deposited into petitioner's trust account and used for his own purposes. Petitioner concocted a cover story to conceal his misconduct. After being threatened with a complaint to the Disciplinary Board, petitioner presented [B] with a check for the full amount drawn not from the estate account, but from petitioner's trust account funded by legal fees from other matters.

With respect to the second charge, petitioner represented both parties involved in a real estate transaction. The settlement funds of $67,299.22 were deposited into petitioner's trust account. From these funds, petitioner was obligated to settle a mortgage, satisfy taxes and utility bills and pay the title insurance premium. Instead, petitioner converted the funds to his own use without the knowledge or consent of the mortgagees, Mr. and Mrs.

[C], or the title insurance company. When the [C] received notices that the mortgage payments were delinquent they attempted, without success, to contact petitioner. The mortgage was eventually satisfied, three months late. The [C] were also advised that the real estate taxes had not been paid and again were unsuccessful in discussing this with petitioner. In February of 1982 the [C] filed a complaint with the bar association against petitioner who then paid the real estate taxes.

When misuse of client funds forms the basis for disbarment, a most cautious eye scrutinizes the reinstatement proceedings. These types of transgressions, where the fiduciary duty owed by an attorney is breached, severely compromises the public trust. And it is this interest to the public which *Keller* instructs we must diligently protect when considering a readmission petition.

This is not to conclude, however, that any disbarment resulting from misappropriation of client funds forecloses reinstatement. In *In re Anonymous No. 67 D.B. 81,* 13 D.&C.4th 652 (1991), the petitioner had been disbarred for mismanagement, commingling and conversion of client funds, failing to maintain adequate escrow records and failure to notify clients of receipt of their funds or to account for monies. Intentional misrepresentations were made to both clients and disciplinary counsel concerning the malfeasance. After discussing the *Keller* threshold, the board concluded that the petitioner's misconduct was not so repugnant to the integrity of the bar or public interest as to preclude possible reinstatement.[2]

---

2. A strong dissent voted against reinstatement, citing both the petitioner's "total lack of respect for the honored fiduciary position

In *In re Anonymous No. 83 D.B. 85,* 13 D.&C.4th 105 (1991), the petitioner had been disbarred after a voluntary resignation based upon an earlier admission that she had misappropriated $32,000 from her family estate. Petitioner's behavior, precipitated in part by a need to pay off her husband's gambling debts, was considered aberrational conduct which was not so outrageous as to prevent consideration of her reinstatement to the Pennsylvania Bar.

Also, in *In re Anonymous No. 26 D.B. 81,* 7 D.&C.4th 260 (1990), an attorney was disbarred for delivery of a bribe to a public official, giving false testimony under oath after a grant of immunity, failing to make appropriate disclosure to a federal grand jury and law enforcement officers, and laundering checks for a public official. The petitioner was reinstated when he showed by clear and convincing evidence that, during his seven year absence from the practice of law, he underwent "qualitative rehabilitation." See also, *In re Anonymous No. 3 D.B. 81,* 3 D.&C.4th 504 (1989) (petitioner was reinstated after consensual disbarment resulting from misuse of client funds caused by gambling problem).

While the present petitioner's conduct was certainly repugnant to the public trust, as in the above cases, it did not rise to the level to nullify consideration of reinstatement. The record shows that the two incidents of misconduct occurred six months apart in the context of an otherwise unblemished record. Other than the title insurance premium the funds were returned within nine months of the misconduct. We consider, too, that

that a lawyer enjoys" and a general reluctance to grant reinstatement when misappropriation of funds is involved.

the petitioner's conduct was linked with emotional problems for which he was seeking treatment. The expert testimony indicates that the petitioner's mental distress may have colored his judgment which, in turn, may have contributed to his professional misconduct. While this emotional difficulty did not mitigate against petitioner's original request for suspension rather than disbarment, it is a factor that we consider here as lessening the otherwise egregious nature of his conduct.

We next look to whether a sufficient period has elapsed during which petitioner has engaged in significant rehabilitation since his disbarment. *Keller, supra* at 578, 506 A.2d at 874-75.

Under *Keller,* admission five years after disbarment is not guaranteed. While no set number of years beyond this point increases the likelihood of reinstatement, often, the longer the absence the greater the opportunity for meaningful rehabilitation. In the instant matter, the quantitative passage of time from disbarment is relatively short, approximately seven years. Readmission is nonetheless appropriate. As already noted, the petitioner committed two acts of misuse of funds, most of which were timely reimbursed over a relatively short period of time. Petitioner's rehabilitative efforts have also been substantial. In the midst of a destructive personal relationship, petitioner removed himself from his troubled environment. He relocated to Arizona and participated enthusiastically in endeavors associated with the paralegal field, without stepping over the prohibition against the practice of law. After a period of years he returned to the legal community where his misconduct occurred. There he continued to serve as a paralegal and actively engaged in providing legal and

non-legal advisory services to his community. He also candidly discussed his prior transgressions with his former colleagues. Petitioner himself testified to his efforts to reattain personal integrity and stability and was convincing in his statements to this effect.

Petitioner was supported in his request for reinstatement by the testimony of 17 [    ] area attorneys. All verified that the petitioner had genuine remorse for his conduct and were confident that his prior misconduct represented isolated aberrant behavior. The testimony of these attorneys, practicing in the community in which the misconduct occurred, suggested that petitioner's return to the practice of law would not be detrimental to either the local bar or the public interest.

Petitioner has thus shown, by clear and convincing evidence, that the passing of a sufficient amount of time, coupled with qualitative rehabilitation, favors immediate consideration of his petition for reinstatement.

Having reached the conclusion that the petitioner has satisfied [  ] threshold, we turn to the requisites of Rule 218(c)(3)(i). Does petitioner possess the moral learning and character in the law necessary to resume practicing law in Pennsylvania? To answer, we must conduct "a searching inquiry into [the] lawyer's present professional and moral fitness to resume the practice of law." *Philadelphia Newspapers Inc. v. Disciplinary Board of Supreme Court,* 468 Pa. 382, 385, 363 A.2d 779, 780 (1976).

The testimony of the petitioner and of the witnesses on his behalf show that since his disbarment, petitioner has demonstrated both the expertise in the law and the moral character to perform his obligations to his

client. Attorneys who employed the petitioner as a paralegal characterized his work as of the highest quality. One attorney offered that he would employ petitioner in his firm should an opening present itself. Documentary evidence, primarily writings submitted in the course of petitioner's employment with a paralegal institute, exhibit legal scholarship. Petitioner also attended the Pennsylvania Bar Institute at [   ] University in August of 1991. In *In re Anonymous No. 18 D.B. 78,* 49 D.&C.3d 298 (1988), it was determined that, although not conclusive on the issue, the taking of the Pennsylvania Bar Institute course was clear and convincing evidence of competency in law. Thus, the quality of petitioner's work and his seminar participation in preparation for his quest for reinstatement provides sufficient evidence that he has maintained the degree of learning in the law required by Pa.R.D.E. 218(c)(3)(i).

Regarding the necessary moral qualifications, there was testimony somewhat troubling concerning petitioner's forthrightness in filling out his petition for reinstatement. Petitioner failed to acknowledge a criminal complaint brought against him by his former girlfriend for an alleged assault. Disciplinary Counsel also averred that petitioner inaccurately completed a loan application to a commercial bank because he failed to check a box disclosing that he had filed bankruptcy proceedings at an earlier date. While we do not dismiss the relevancy of these oversights, petitioner gave a plausible explanation for both occurrences. First, petitioner claimed that he was unaware of the criminal charges brought against him, that he was never arrested and never underwent any judicial proceedings relative to the matter. There is no contradictory evidence on this point. As

to the suggested false statement on the loan application, the box to be checked was apparently quite small. The petitioner stated that the loan was cosigned by his employer at the time who was aware, as was the bank, of petitioner's prior bankruptcy. We thus accept petitioner's explanation that his failure to check the box was a clerical error not designed to deceive the lender.

Otherwise, the tone of the evidence received regarding the petitioner's moral character was overwhelmingly positive. It was the understanding of those testifying on petitioner's behalf that he was a respected well-liked member of the bar, who, due to a period of emotional instability, displayed aberrant behavior in his practice of law. These witnesses were persuasive in their opinions that the petitioner has successfully put this period behind him and the taint of his prior transgressions has been eradicated.

We, therefore, conclude that petitioner, having satisfied the *Keller* threshold inquiry and the requisites of Rule 218 has shown himself to be standing ready to resume the practice of law in the tradition of integrity and preservation of public trust.

## V. RECOMMENDATION

For the foregoing reasons, the board recommends that the petition for reinstatement for [petitioner] be granted.

Pursuant to Pa.R.D.E. 218(e), the board further recommends that petitioner be directed to pay the necessary expenses incurred in the investigating and processing of the petition.

74

Messrs. Schiller and Leonard did not participate in the adjudication.

## ORDER

And now, October 11, 1994, upon consideration of the report and recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania dated April 20, 1994, the petition for reinstatement is granted.

Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.

Mr. Justice Montemuro is sitting by designation.