**In re Anonymous No. 55 D.B. 82**

Disciplinary Board Docket No. 55 D.B. 82.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

LEONARD, *Member,* September 2, 1992—Pursuant to Rule 218(C)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendation to your honorable court with respect to the above-captioned petition for reinstatement.

## PROCEDURAL BACKGROUND

On September 9, 1982, this court accepted petitioner's resignation from the bar of the Commonwealth of Pennsylvania pursuant to Pa.R.D.E. 215 and ordered him disbarred on consent. Petitioner filed for reinstatement to the bar on August 15, 1988. Hearing Committee [    ]—comprised of chairperson [    ], Esquire, and members [    ], Esquire and [    ], Esquire—conducted hearings on the petition on August 7, 1990, September 27, 1990, and November 29, 1990. The committee filed a report recommending that reinstatement be granted on May 15, 1991.

The Office of Disciplinary Counsel excepted to the committee's recommendation and filed a brief in support of its exceptions on May 31, 1991. Petitioner filed a brief in response to the Disciplinary Counsel's exceptions on June 26, 1991. The matter was subsequently adjudicated at the board's July 1991 meeting.

## FINDINGS OF FACT

The board adopts the committee's findings of facts as follows:

(1) Petitioner is 44 years of age. Petitioner received a bachelor's of art degree from [ ] University in 1970 and, thereafter, attended [ ] Law School. He received his juris doctor degree from [ ] Law School in 1973.

(2) In October 1973, petitioner was admitted to the Supreme Court of Pennsylvania and the U.S. District Court for the [ ] District of Pennsylvania.

(3) Upon graduation from law school, petitioner served as a special assistant attorney general from November 1973 to March 1978. He left the employ of the Office of the Attorney General to run for the state legislature.

(4) In November of 1973, petitioner was also a partner in the former law firm of [A] until November 1979, at which time the law partnership dissolved. Thereafter, petitioner was a sole practitioner until his resignation from the bar in August of 1982.

(5) On August 4, 1982, petitioner submitted his verified resignation statement pursuant to Pa.R.D.E. 215, resigning from the practice of law in the Commonwealth of Pennsylvania.

(6) In his resignation statement, petitioner acknowledged that he was aware of investigations by Disciplinary Counsel concerning allegations of professional misconduct as set forth in six unrelated disciplinary complaints and letters of inquiry. Petitioner further acknowledged that he could not successfully defend against the allegations of misconduct contained in the letters of inquiry.

(7) The allegations of professional misconduct included violations of the following Disciplinary Rules: D.R. 1-102(A)(3); D.R. 1-102(A)(4); D.R. 1-102(A)(5); D.R. 1-102(A)(6); D.R. 2-110(A)(3); D.R. 5-101(A); D.R. 5-104(A); D.R. 6-101(A)(3); D.R. 7-101(A)(1); D.R. 7-101(A)(2); D.R. 7-101(A)(3); D.R. 9-102(A); D.R. 9-102(B)(3); and D.R. 9-102(B)(4).

(8) Petitioner attributed his professional misconduct to problems that he encountered in his law practice. Petitioner acknowledged that he did not have the business sense, the discipline or organizational skills necessary to run a high-volume practice.

(9) Petitioner attributed his financial difficulties to a decrease in real estate work and a high-volume practice with a small profit margin.

(10) Petitioner acknowledged that his "great inclination was to avoid problems and to assume matters would resolve themselves." (Petition at p. 16.) He believed that his "financial problems would be solved by that 'big check,'" which he never received. He admits that he "was a classic 'avoider of responsibility.'" (*Id.*)

(11) Petitioner also attributes his misconduct to marital difficulties in the late 1970s through the early 1980s.

During that time, petitioner and his wife had separated twice.

(12) Petitioner testified that he had ignored the gravity of the situation and had held unrealistic beliefs that if he just kept "hanging on," it would somehow "work itself out." (N.T. 1 at p.63.)

(13) Most of petitioner's actions, which resulted in professional misconduct, involved the use of one client's funds to sustain the case of another client or for his own benefit, i.e., overhead. In addition, petitioner wrote checks to clients and to the prothonotary of [    ] which lacked sufficient funds. As a result, numerous cases were not filed in a timely fashion.

(14) Petitioner was disbarred (on consent) from the practice of law in the Commonwealth of Pennsylvania by order of the Supreme Court of Pennsylvania, dated September 9, 1982.

(15) Petitioner filed his petition and reinstatement questionnaire, form D.B. 36, on August 15, 1988.

(16) During the period of disbarment, petitioner was employed as an insurance salesperson by [B] Life Insurance Co. from August 1982 through April 1984. In April 1984, after a dispute with his supervisor concerning the competitiveness of the workplace, petitioner quit his job.

(17) Petitioner was self-employed as an insurance salesperson from September 1984 to November 1984. In November of 1984, he joined [C] Life as an insurance salesperson, until August of 1986.

(18) From November of 1986 through December of 1986, petitioner was a sales clerk at [D]. This position

was temporary employment during the Christmas holidays.

(19) In January of 1987, petitioner served as field coordinator covering the Northeast section of [ ] for the [E] For Mayor Campaign until February of 1987.

(20) From May of 1987 to November of 1987, petitioner was a telephone insurance solicitor as well as a substitute teacher for the [ ] School District from April of 1987 to October of 1987.

(21) In October of 1987, petitioner was hired by the Commonwealth of Pennsylvania (Department of Labor and Industry—Worker's Compensation Bureau) as a law clerk. His primary responsibilities included drafting opinions for worker's compensation referees at the Worker's Compensation Bureau. Petitioner held this position until September of 1989.

(22) While employed as a law clerk to the Worker's Compensation Bureau, petitioner was reprimanded three times.

(23) The first reprimand occurred in June of 1988 and concerned excessive personal phone calls.

(24) The second reprimand involved an incident which occurred on April 19, 1989. At the time, petitioner was serving as the prothonotary for the Worker's Compensation Bureau, a position created by referee [F]. Petitioner's primary responsibility as prothonotary was to schedule worker's compensation hearings. In this regard, petitioner had difficulty securing the cooperation of office staff, which resulted in an altercation between petitioner and a secretary. Another referee, referee [G], interceded. Petitioner pushed him aside. Immediately after the incident,

petitioner apologized to the secretary. Petitioner admitted that he "didn't use the best judgment at the time" and that he lost his temper. (N.T. 1 at p.86.)

(25) The third reprimand occurred in July of 1989. In July of 1989, petitioner had a disagreement with a secretary. His supervisor, referee [F], wanted to talk to petitioner about "the incident." Petitioner then "lost control" and took a bag with two cans of soda in it and threw it down the hall. (N.T. 1 at p.92.) Thereafter, referee [F] asked petitioner to leave the premises. He also advised him that he would be suspended.

(26) By letter dated August 2, 1989, petitioner formally notified his supervisor that he intended to file a claim for worker's compensation benefits for stress suffered as a result of the July 1989 incident.

(27) Petitioner did not follow through with his worker's compensation claim, because he subsequently gained employment as an employee with a law firm.

(28) Petitioner immediately sought counseling as a result of the incident. Petitioner was seen by Dr. [H], who was part of a counseling group affiliated with [   ] Hospital. He was subsequently referred by Dr. [H] to a therapist, [I]. Petitioner had been seeing the therapist bi-weekly, but more recently, he sees a therapist on an intermittent basis for "maintenance."

(29) On August 18, 1989, petitioner's employment with the Worker's Compensation Bureau was terminated, effective September 1, 1989, as a result of the incidents which occurred in April and July of 1989.

(30) Petitioner's performance evaluation report at the Worker's Compensation Bureau reflects ratings of "ex-

cellent" for "relationship with people"; "very good" for "quality of work," "initiative" and "analytical ability"; and "good" for "work habits," "dependability" and "quantity of work performed." Petitioner received an overall evaluation of "very good."

(31) After petitioner was terminated by the Worker's Compensation Bureau, he secured employment as a law clerk for [J], Esquire. Petitioner has worked as a law clerk for [J] full-time (approximately 40 to 55 hours per week) from September of 1989 through the present. He also works part-time for [K], Esquire, and [L], Esquire. His work primarily involves research and writing briefs and other legal documents.

(32) Petitioner has been involved in the [   ] Party in Pennsylvania for most of his adult life. He held the position of vice chair of the [   ]—[   ] [   ] Committee from 1984 to 1986. In 1986, petitioner was elected as a representative to the State [   ] Committee from [   ] County. He was re-elected to a second and third term in 1988 and 1990, respectively. He has also served as a member of the [   ] Caucus of the State [   ] Committee as well as the Executive Committee of the [   ] County [   ] Committee. Petitioner has also worked on several campaigns for different political candidates.

(33) Petitioner has been involved in the community and with various civic organizations. He has served as a volunteer fund raiser for the [   ] Library. He has also been active in the [   ] Civic Association and the [   ] Chapter of the ALS Foundation. In addition, in 1985, when the [   ] School District teacher's strike occurred, he coordinated an ad hoc committee which acted

as a liaison group between the teachers, parents and administration.

(34) Petitioner has maintained his knowledge of the law.

(35) In August of 1987, petitioner attended the three-day seminar sponsored by the Pennsylvania Bar Institute held at [    ] Law School in [    ], Pennsylvania, pursuant to §89.279 of the Disciplinary Board Rules and Procedures.

(36) Petitioner has kept abreast of the law. He has read and continues to read various advance sheets at [    ] Law School. Since 1987, he has been actively working in the law, particularly in the worker's compensation area. He has written legal opinions and has performed legal research.

(37) Petitioner admits that he did not comply with Pa.R.D.E. 217, which requires that clients be notified of an attorney's disbarment within 30 days of the effective date of disbarment.

(38) Petitioner testified that he did not believe he had to comply with Pa.R.D.E. 217, because he, (1) "had no intention of ever practicing law again," (2) had referred most of his files to another attorney, [M], Esquire; and (3) did not have the funds to do so. (N.T. 1 at pp.110, 117, 139.)

(39) At the time petitioner referred the bulk of his cases to [M] (approximately 75), petitioner believed that [M] would send letters to his clients notifying them of the successor representation. The balance of petitioner's files were put in storage and were damaged in a flood.

(40) On at least two occasions, petitioner was informed by [    ], secretary to the Disciplinary Board of the Supreme Court of Pennsylvania, of the requirement of Pa.R.D.E. 217, which mandates that a disbarred attorney notify his clients of the disbarment and inability to represent them further. Petitioner was also notified by [    ], formerly assistant Disciplinary Counsel, of the requirement of Pa.R.D.E. 217.

(41) On August 26, 1986, December 11, 1989, and July 17, 1990, counsel for petitioner sent letters to [M] requesting information concerning notification to petitioner's former clients.

(42) In November of 1989, petitioner obtained information from the court, including a computer print-out of cases where he appeared as counsel of record to facilitate notification to former clients.

(43) In January of 1990, petitioner attempted to obtain further information from various courts to notify former clients of his disbarment.

(44) In January and February of 1990, petitioner did, in fact, attempt to notify former clients. His efforts were partially successful as only those former clients that could be identified were notified.

(45) Petitioner, testified that when he submitted his petition on August 15, 1988, he did his best to be candid, honest and thorough. He also reviewed the petition prior to signing it and certified that his answers were true and correct to the best of his knowledge under penalty of perjury.

(46) The evidence supports the following findings of fact with respect to petitioner's statements contained in the petition and supporting questionnaire:

(a) In response to question 7(a), petitioner denied that he had ever been disciplined by any other court.

(b) By order dated October 21, 1982, of the U.S. District Court for the [   ] District of Pennsylvania, petitioner had been disbarred on consent from practicing law in federal court.

(c) In response to question 10, petitioner stated that:

i. There were numerous personal civil suits filed against him at and around the time of his disbarment;

ii. He was in the process of gathering as much information as he could about these cases, but he had no personal records and no cases remained pending against him;

iii. A docket search in [   ] County reflected no unsatisfied judgments and no cases pending against him;

iv. He had requested a similar search in [   ] County;

v. He would submit information concerning the various civil actions to which he was a party as soon as he received the information.

(d) Petitioner did not submit any additional information concerning the civil actions to which he had been a party.

(e) In 1985, petitioner initiated the civil action against the U.S. Internal Revenue Service captioned, [*Petitioner*], *et al. v.* [*N*], *Chief Internal Revenue Service, et al.,* U.S. District Court for the [   ] of Pennsylvania, No. [   ]. This action was dismissed in September 1986 for lack of prosecution.

(f) The following judgments were outstanding and marked unsatisfied on the court dockets at the time petitioner submitted his petition:

i. [O] v. [Petitioner], C.P. [     ] Co., No. [     ].

ii. [P] v. [Petitioner], C.P., [     ] Co., No. [     ].

iii. [Q] Bank v. [Petitioner] and [R], C.P., [     ] Co., No. [     ].

The judgments have since been satisfied.

(47) Petitioner has not filed his personal income tax returns by April 15 of the following years: 1987, 1988 and 1989.

(48) Petitioner sought and obtained extensions for his 1987 and 1989 tax returns although ultimately the filing of the tax returns was apparently delayed.

(49) Although no documentary evidence was provided, petitioner testified that he obtained an extension of time to file his 1988 tax return.

(50) Petitioner was informed by letter dated March 24, 1987, of his obligation to compensate the Client Security Fund for payments it had made to compensate petitioner's clients for the financial losses they sustained.

(51) Petitioner testified that he attempted to contact the Client Security Fund by telephone on several occasions to clarify the matter. However, none of his telephone calls to the Client Security Fund were ever returned.

(52) Petitioner, through his attorney, made the following payments to the Client Security Fund: $500 on February 9, 1989; $350 on January 11, 1990; $42.34 on January 22, 1990. These payments satisfied his outstand-

ing balance plus the mandated 10 percent interest per annum.

(53) In April of 1988, petitioner entered into an agreement with the prothonotary of the Court of Common Pleas of [    ] County to pay him $50 per month to reimburse him for a debt of $1,347.50, which resulted from the tendering of checks to the prothonotary in 1982, all of which lacked sufficient funds.

(54) As of the date of petitioner's submission of the petition, he had only made four payments to the prothonotary. Petitioner made one more payment to the prothonotary during the pendency of his petition. On January 22, 1990, petitioner satisfied the agreement with the prothonotary and paid his debt in full. Petitioner also made payments and attempted to make payments to former clients to satisfy the amounts owed.

(55) In April of 1987, petitioner separated from his wife. The divorce decree was final on February 29, 1988.

(56) His current relationship with his former wife is a very good one. His relationship with his daughter suffered at the time of the separation and divorce, but is now improving.

(57) At the reinstatement hearing, petitioner produced nine witnesses, all of whom attested to petitioner's present moral qualifications and excellent reputation in the community.

(58) The persons who testified were: [E], Esquire; [S]; [K], Esquire; [J], Esquire; [T], Esquire; [U]; [V]; [W], Esquire; [X].

(59) The character witnesses, including five attorneys, three worker's compensation referees and one business person testified to petitioner's abilities (legal and oth-

erwise), integrity, ethics and competence. They respect petitioner notwithstanding his disbarment.

(60) A number of petitioner's character witnesses testified that petitioner is good with people and is able to accomplish what he chooses to do.

(61) Petitioner has demonstrated regret for his conduct that led to his resignation and subsequent disbarment on consent. Petitioner testified that he made serious mistakes and errors in judgment and he knows what he did was wrong.

(62) Petitioner testified that he has learned from his past mistakes.

(63) Petitioner testified that, if readmitted, he would change the way in which he practices. Petitioner would never again practice by himself. Petitioner understands his own limitations.

(64) Petitioner recognizes that he is not able to handle his own practice. If reinstated, he would only work for a law firm or governmental agency.

## CONCLUSIONS OF LAW

(1) The misconduct that resulted in petitioner's disbarment in 1982 was not so egregious as to preclude the immediate consideration of his petition for reinstatement.

(2) Petitioner has proved by clear and convincing evidence that he possesses sufficient moral qualifications, competency and learning in the law to resume the practice of law in the Commonwealth.

(3) Petitioner may recommence the practice of law in this Commonwealth without harming the integrity of the bar or the public interest.

## DISCUSSION

The board must undertake a two-part analysis when considering a petition for reinstatement. First, the board is required to determine whether petitioner's misconduct was so outrageous as to entirely preclude his reinstatement at this time. See *Office of Disciplinary Counsel v. [Y]*, 4 D.B. 76 at 4. Next, the board must determine whether petitioner has reformed sufficiently from the conduct that prompted his disbarment. This finding requires an evaluation of the length and quality of petitioner's rehabilitation. See *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986). To obtain reinstatement under this test, petitioner must prove by clear and convincing evidence that he possesses the necessary moral qualifications and learning in the law to resume practice in the Commonwealth of Pennsylvania, and that his reinstatement will neither be detrimental to the integrity of the bar, nor subversive of the public interest. See Pa.R.D.E. 218(c)(3)(i).

## A. *Petitioner's past misconduct does not preclude consideration of his petition for reinstatement.*

Petitioner's disbarment resulted principally from his habitual misuse of client funds. The evidence shows that petitioner, during his three years as a sole practitioner, typically diverted retainer fees to the payment of office overhead expenses, and expected future retainers from different clients to pay the expenses incurred in cases

from which retainers had previously been diverted. Petitioner soon discovered, however, that this pyramid scheme was sustainable only if his income was sufficient to offset both the previously diverted fees *and* new office overhead expenses.

Petitioner's law practice eventually collapsed when his income did not keep pace with his multiplying financial obligations. Because petitioner was unable to pay the costs necessary to commence a case and move it forward after accepting fees, he neglected his clients' interests. In addition, petitioner endorsed uncollectible checks to both clients and the prothonotary of the [    ] County Court of Common Pleas. While petitioner's misconduct was undeniably grave, his offenses were not so egregious as to preclude reinstatement.

Attorneys have won reinstatement to the bar after committing far more serious wrongdoing. For instance, in *In re [Z]*, 26 D.B. 81, the petitioner was reinstated to the bar although he was found to have delivered a bribe to a public official, perjured himself before a federal grand jury, withheld information from a federal grand jury and law enforcement officers, and laundered checks for a public official. Petitioner's transgressions—which plainly were induced by ineptitude and desperation—do not even approach the level of malfeasance involved in *[Z]*, *(testimony disclosed that petitioner apparently derived no personal gain from his misconduct.)*

Rather, the misconduct in this case is analogous to that described in *In re [AA]*, 4 & 35 D.B. 79. In *[AA]*, the petitioner was reinstated despite being disbarred by consent for accepting more work than he could handle

in a timely and competent manner, neglecting cases for which he had been retained, and misrepresenting to clients material facts about the status of their cases. The same result should obtain here. Petitioner undoubtedly deserved a compulsory hiatus from the practice of law, but his integrity was not so tarnished as to prevent the board's consideration of his reinstatement. Accordingly, this petition was properly before the board.

B. *Petitioner demonstrated by clear and convincing evidence that reinstatement should be granted.*

Petitioner identified two catalysts for the misconduct that ultimately caused his disbarment: (1) his inability to manage a high-volume, low-margin solo practice; and (2) his psychological incapacity to either admit that his practice was failing or address its problems in a rational way. The board is obligated to evaluate whether petitioner has successfully mastered these personal weaknesses before recommending reinstatement.

The evidence shows that petitioner plans to practice law only in a supervised environment, and that he now attempts to take an aggressive approach to problem-solving. Further, petitioner has attempted, albeit belatedly, to make full restitution to those who suffered financial injury from his past misconduct. In addition, petitioner has involved himself in local political and community service activities. The petitioner's strenuous efforts at rehabilitation demonstrate conclusively that his reinstatement will not compromise the integrity of the bar.

Next, the board must determine whether petitioner has met his burden of proving by clear and convincing evidence that he has the moral qualifications and learning

in the law required to practice law in Pennsylvania, and that his reinstatement will not subvert the public interest or taint the integrity of the bar. See Pa.R.D.E. 203, Pa.R.D.E. 218(c)(3)(i).

An attorney petitioning for reinstatement may prove that he has the requisite moral qualifications by presenting favorable testimony from respected members of the bar. See *In re [BB],* 18 D.B. 78; *In re [AA],* 4 & 5 D.B. 79. In this case, petitioner presented such testimony from five attorneys, as well as from four other witnesses. This testimony is more than sufficient to sustain petitioner's burden, and provides sufficient evidence of his moral fitness to practice law in this Commonwealth.

Finally, there is no question that petitioner has maintained adequate learning in the law. While disbarred, petitioner has been employed as a law clerk for a significant period of time. This employment, together with his regular reading of advance sheets at [   ] Law Library, has kept him abreast of current developments in the law. In addition, petitioner attended a Pennsylvania Bar Institute seminar in [   ] during August 1987. Thus, petitioner's return to practice will harm neither the public interest nor the integrity of the bar.

## RECOMMENDATION

For all the foregoing reasons, the board respectfully requests that the instant petition for reinstatement be granted. The board further recommends pursuant to Pa.R.D.E. 218(e) that petitioner be ordered to pay the necessary expenses incurred in the investigation and processing of his petition for reinstatement.

Dr. Gilbert and Mr. Hill dissent.

Mr. Schiller recused himself.

Messrs. Keller and Paris did not participate in the adjudication.

### ORDER

And now, September 2, 1992, a rule having been issued upon [petitioner] on July 1, 1992, to show cause why an order denying reinstatement should not be entered, upon consideration of the response filed, the rule is made absolute and the petition for reinstatement is hereby denied. Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the Disciplinary Board in the investigation and processing of the petition for reinstatement.