**In re Anonymous No. 100 D.B. 84**

318

Disciplinary Board Docket no. 100 D.B. 84.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

GILBERT, *Member,* November 3, 1992—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your Honorable Court with respect to the above-captioned petition for reinstatement.

## I. HISTORY OF PROCEEDINGS

[   ], petitioner, was disbarred on consent by Supreme Court order dated December 14, 1984, and it became effective as of January 14, 1985. Petitioner's disbarment resulted from both his failure to make the required disposition of funds that clients had entrusted

to him for payment to petitioner's employer, as well as for his unlawful taking of those funds.

On June 27, 1991, a petition for reinstatement was filed.

On July 2, 1991, the matter was referred to Hearing Committee [    ], which was chaired by [    ], Esquire, and included members [    ], Esquire and [    ], Esquire.

On September 16, 1991, petitioner filed an amended reinstatement questionnaire. A reinstatement hearing was held on September 25, 1991. On October 7, 1991, the hearing committee received a copy of petitioner's memorandum of law.

On December 30, 1991, the Hearing Committee filed its report and recommended that the petition for reinstatement be granted.

The matter was adjudicated at the March 5, 1992 meeting of the disciplinary board of the Supreme Court of Pennsylvania.

## II. FINDINGS OF FACT

The board adopts the findings of fact which are contained in the report of Hearing Committee [    ] and supported by documentary and testimonial evidence.

(1) Petitioner, [    ] was born on May 14, 1949. He was admitted to practice law in the Commonwealth of Pennsylvania in 1978, and immediately thereafter, he began practicing at the firm of [A] & [B], P.C., in [    ], Pennsylvania. (N.T. 4, 5.)

(2) In November 1984, petitioner was confronted by a partner at his firm and questioned about a check in the amount of $250 received from a client of the firm, which petitioner had endorsed and negotiated to his personal account. (N.T. 6.)

(3) Petitioner immediately admitted this misappropriation and further confessed to having extracted approximately $40,000 over the number of years. (N.T. 6.)

(4) On that same day in 1984, petitioner approached the President Judge, [C], and admitted the situation and consented to refrain from practicing law pending the outcome of the board's proceedings. (N.T. 6, 7.)

(5) The funds had come into petitioner's possession through his instructions to clients to endorse their checks directly to him; thus, there was neither a presence of forgery involved nor any indication that client services had been jeopardized.

(6) These inappropriately acquired funds were utilized by petitioner to purchase personal items, as well as to establish a pension plan to protect himself and his wife at the time, who had been diagnosed with cancer. (N.T. 43, 44.)

(7) On December 7, 1984, petitioner consented to immediate voluntary disbarment. An order to that effect was entered by the Supreme Court of Pennsylvania on December 14, 1984, and it became effective on January 14, 1985. (N.T. 7.)

(8) On August 15, 1985, petitioner pled guilty to criminal charges involving the misappropriation of $54,398.02 from the law firm of [A] & [B], P.C. (N.T. 7, 8.)

(9) From the time of petitioner's arrest until his sentencing, he not only updated [A] & [B], P.C. on the files that he had been handling, but he also kept abreast of the law by maintaining a law clerk position at the firm of [D], P.C. (N.T. 9.)

(10) Petitioner's sentence was imposed on October 4, 1985. Petitioner was sentenced to 11 1/2 to 23 months

of incarceration (of which he was imprisoned for 11 1/2 months); a fine of $2,000; and the payment of restitution and costs. (N.T. 8, 10.)

(11) After six months of incarceration, petitioner was allowed to enter [      ] County's work release program; he obtained employment with a local head trauma rehabilitation facility as a nurse's aide, at an entry level position. (N.T. 9, 10.)

(12) At the time of petitioner's parole, he remained at the rehabilitation facility in the capacity of vocational therapist until May 1990. (N.T. 20.)

(13) In May 1990, petitioner became employed at [E] & [F], P.C., where he has maintained his familiarity with the law by performing the following duties in the capacity of a law clerk: legal research, writing briefs, drafting pleadings, and taking information from clients. (N.T. 21, 22.)

(14) In addition, petitioner has participated in an intensive program of counseling and psychotherapy for several years to gain instructive and lasting understanding of his reprehensible misconduct and to avoid its repetition. (N.T. 17, 18.)

(15) At this time, petitioner has made full restitution for the funds that he had inappropriately withdrawn. His payments began even prior to his guilty plea, and complete satisfaction was acknowledged over time in the following manner:

(a) In 1984, petitioner remitted a total of $47,133.69, which was derived from the endorsement of investments owned by petitioner and his wife at that time. (N.T. 10, 11; exh. 1.)

(b) In 1985, petitioner remitted a total of $28,817.12. (N.T. 11, 12; exh. 2.)

(c) In 1986 and 1987, petitioner remitted $92 and $972.33 respectively. (N.T. 14, 15; exh. 3.)

(16) Payment of the restitution in the above mentioned paragraph was primarily derived from petitioner and his former wife's joint assets when he instituted the transformation of assignment of investments to [A] & [B], P.C. These investments included the surrendering of a retirement plan consisting of bonds, municipal bonds, and mutual funds. In addition, partial restitution was derived from petitioner's personal earnings during his work release program. (N.T. 10, 11, 12.)

(17) Petitioner also initiated the preparation of amended tax returns to reflect the restitution payments, and all delinquent taxes were paid by petitioner to the Internal Revenue Service. (N.T. 10, 11, 12, 13, 35.)

(18) During his disbarment, petitioner has kept informed of developments in the legal field by reading various legal publications such as the advance sheets of the Atlantic 2d, horn books, Pennsylvania Bar Institute publications, as well as ALR 3rd and 4th and Federal. Also, petitioner has read and has become familiar with the new Rules of Professional Conduct. (N.T. 21.)

(19) In addition, petitioner completed a Pennsylvania Bar Institute legal practice course called Bridge-The-Gap, which covered every area of law. Petitioner also successfully completed the eight courses required by the Pennsylvania Bar Institute in filing for reinstatement.

(20) At the September 25, 1991 reinstatement hearing, several witnesses testified to petitioner's excellent reputation in the community for truthfulness and honesty as well as his conscientiousness and competence in completing his work.

## III. CONCLUSIONS OF LAW

(1) The misconduct for which petitioner was disbarred is not so egregious as to preclude immediate consideration of his petition for reinstatement.

(2) Petitioner has sustained his burden of proving he possesses the moral qualifications, competency, and learning in the law required of an attorney licensed to practice law in the Commonwealth of Pennsylvania.

(3) Petitioner's resumption of the practice of law will neither compromise the integrity of the bar nor subvert the interests of the public.

## IV. DISCUSSION

The sole issue for contemplation by the board is the following: whether petitioner's request for readmission to the Pennsylvania Bar should be granted. In making that determination, the board must decide whether petitioner has satisfied the two levels of inquiry that are necessary for completion prior to the board's finding that an attorney is fit to practice law and a reinstatement should be granted.

The threshold question at the first level of inquiry is whether an attorney could resume the practice of law, despite past violations, while neither adversely affecting "the integrity and standing of the bar or the administration of justice nor [being] subversive of the public interest." *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 579, 506 A.2d 872, 875 (1986); Pa.R.D.E. 218(c)(3)(i). The second level of inquiry is whether the disbarred attorney has the moral qualifications, as well as the competency and learning in law that is required of all practicing attorneys in the Commonwealth of Pennsylvania. Pa.R.D.E. 218(c)(3)(i).

The crucial need for both levels to be adequately fulfilled cannot be stressed enough. The practice of law is a privilege, not a right, and will not be automatically reinstituted once taken away. See *Keller, supra* at 579, 506 A.2d at 875. The burden of proof for showing that the two tiers are sufficiently met is placed upon the attorney who desires to be reinstated into the legal system. *Office of Disciplinary Counsel v. [G]*, 4 D.B. 76 (1989); Pa.R.D.E. 218(c)(3)(i). The standard by which this proof must transcend is by clear and convincing evidence. *Id.*

### A. *First Level of Inquiry: The Keller Threshold*

The *Keller* threshold requires that once an attorney has been disbarred, that attorney could only resume the practice of law if it is determined that this action will not have a detrimental effect on either the bar or the public at large. *Keller, supra* at 579, 506 A.2d at 875. This determination is rendered through thoughtful analysis of both the offense that initiated the disbarment proceedings and its underlying causes, to ascertain whether the totality of circumstances was so egregious that it precludes reinstatement. *[G]*, 4 D.B. 76 at 4. The important pivotal fact is deciding if the attorney has been rehabilitated, thus diminishing the likelihood of the misconduct resurfacing as a future violation.

In the instant case, the offense and its underlying cause involved petitioner's redirection of client funds, without the use of forgery, and his misappropriation of those funds for his personal use. The circumstances under which this misconduct ensued initiated with petitioner's employment at [A] & [B], P.C. in 1978. Petitioner diligently performed his legal duties to the firm by working between 60 to 80 hours a week. (N.T. 16.)

In addition, he maintained a high profile in the outlying community by taking part in civic organizations and community service activities. A major part of petitioner's eagerness to dedicate his time and energy to these volunteer activities was to make himself more visible to the public in the hope of benefiting his firm. (N.T. 16, 17.) In fact, these actions did reflect back to [A] & [B], P.C. since petitioner ultimately brought in new business to the firm. (N.T. 16.) Meanwhile, petitioner strove for the partnership position that he had been told would eventually materialize.

As the years passed and petitioner maintained his rigorous work schedule, his partnership goal seemed to be less and less of an option. This crystallized when another attorney was hired who appeared to be elevated toward partnership immediately upon his arrival.

Finally, not knowing how to deal with the conflict and after expending years of diligent service to the firm, petitioner dealt with the situation by taking something away from the firm. Petitioner began by instructing one client to write out his fee payment check directly in petitioner's name. Petitioner then utilized these funds for his personal use, including setting up a pension fund since his wife at the time had been diagnosed with cancer and had begun expensive treatment. Despite misappropriation of funds, however, petitioner remained dedicated to representing the clients' interests. Thus, the evidence shows that his actions did not prejudice the clients' claims in any way.

One client's check led to another, until he was confronted by a partner at [A] & [B], P.C. in 1984. At that time, petitioner immediately accepted responsibility for the situation and was even relieved that he no longer had to carry the hidden burden. (N.T. 6, 7.)

A review of Pennsylvania case law substantiates the board's opinion that petitioner's misconduct is not so repugnant to the integrity of the bar or public interest as to obviate his possible reinstatement. See *Office of Disciplinary Counsel v. [H],* 26 D.B. 81 (1990) (reinstatement granted to attorney who not only "laundered" checks, but who also bribed public officials and gave false testimony under oath among other violations). See *In re Anonymous,* Nos. 4 and 35 D.B. 79, 5 D.&C.4th 557 (1989) (reinstatement granted even though attorney deceived his clients by making material misrepresentations to his clients).

A case which presents facts that are similar to the instant case is *In re Anonymous No. 16 D.B. 85,* 49 D.&C.3d 293 (1988) in which "the petitioner" in that case had been found guilty of misappropriating funds without causing injury to the clients. In addition, in that case "the petitioner" was even held guilty of both forgery and misrepresentation of facts. Despite this conduct, the Supreme Court of Pennsylvania issued reinstatement after concluding that "the petitioner" had rehabilitated himself.

In comparing *No. 16 D.B. 85, supra,* to the case at hand, as well as other applicable case law, the board is confident in its determination that reinstatement is also proper here since petitioner's actions are *not* so egregious that reinstatement should be denied. Not only did petitioner exhibit extreme remorse and shame in taking client money, but he also did not engage in acts of forgery as in the previously mentioned case in which reinstatement was granted. Furthermore, immediately upon admitting his misconduct, petitioner engaged in counseling in an effort to get to the root of his problem. This act of rehabilitative measures is a primary consideration in the grant of a reinstatement. *Philadelphia*

*Newspapers, Inc. v. The Disciplinary Board of the Supreme Court of Pennsylvania,* 468 Pa. 382, 363 A.2d 779 (1976). Petitioner testified as to the effectiveness of his therapy by stating: "I've learned to acknowledge that conflict exists and to deal with it directly...." (N.T. 18.)

## B. *Second Level of Inquiry:*

### 1. Moral Qualifications

The second level of inquiry involves whether a petitioner possesses the necessary moral character to practice law in the Commonwealth of Pennsylvania. Rule 218(c)(3)(i), Pa.R.D.E. The standard is clear and convincing evidence, and its proof rests on the shoulders of the attorney requesting reinstatement. *Id.*

In the instant matter, petitioner has made complete restitution of the funds. In fact, 90 percent of these funds were satisfied prior to his entry of his guilty plea.

Furthermore, petitioner has experienced change in his personal life. His first marriage dissolved after experiencing a myriad of problems, and he is now married to a supportive wife. He attends church regularly and is becoming a part of the community once again.

Most importantly, petitioner has cleansed his professional life by learning how to deal with stress and problems. This was accomplished through counseling, as well as through his involvement in the trauma unit where he was able to apply what he had learned in counseling. Each day, petitioner was thrown into a situation of dealing with neurologically impaired clients who depended on him to make things work. His ultimate goal is to pursue a practice which would encompass the handling of head trauma cases. In pursuit of this

goal, he is presently employed as a law clerk at a firm in which he may find future employment as an attorney upon his reinstatement.

Traditionally, many disbarred attorneys have presented testimony from numerous character witnesses to prove their moral fitness to be reinstated. *In re Anonymous, Nos. 4 and 35 D.B. 79, supra* and *In re Anonymous, No. 48 D.B. 77,* 36 D.&C.3d 51 (1984). In the case at hand, many people came forward to testify to petitioner's excellent reputation in the community for his truthfulness and honesty. [K], director of operations for the [ ] Associates, testified that petitioner handled funds as part of his employment with the trauma center, and that he was "honorable" and "competent" in this area. (N.T. 56, 57.) Furthermore, [L], an associate of [E] & [F] where petitioner had been employed, provided a statement which stated that petitioner's "work product, as far as research and other matters, is better than certain associates that were employed by us...." (N.T. 70, 71.)

## 2. Competency and Learning in the Law

Also included within the second level of inquiry is a reflection upon whether the attorney has remained knowledgeable of the law during his period of disbarment. Rule 218(c)(3)(i), Pa.R.D.E. Petitioner's actions have adequately satisfied this inquiry. This is established by his enrollment in a Pennsylvania Bar Institute legal practice course, as well as his completion of the eight required Pennsylvania Bar Institute courses from January 1991 to March 1991. Furthermore, petitioner has remained informed in legal charges by reading advance sheets, horn books Atlantic 2d, and ALR. Also, petitioner has made it his duty to review and encompass the Rules of Professional Conduct, which came into effect in 1988

during his period of disbarment. Finally, petitioner has been employed as a law clerk and has maintained up-to-date on performing legal research.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that the petition for reinstatement of [petitioner] to practice law in the Commonwealth of Pennsylvania be granted.

The board further recommends that, pursuant to Rule 218(e), Pa.R.D.E., petitioner be directed to pay the necessary expenses incurred in investigating and processing of said petition for reinstatement.

Mr. Hill dissents.

Ms. Flaherty and Messrs. Gilardi and Eckell did not participate in the adjudication.

## DISSENTING OPINION

HILL, *Member,* November 3, 1992—I respectfully dissent from the majority of the board that has recommended that the [petitioner] be reinstated. [Petitioner] was disbarred by this Honorable Court on December 14, 1984, effective January 15, 1985. Petitioner had been an associate attorney at the firm of [A] & [B], P.C., in [    ], Pennsylvania. After being denied partnership, petitioner developed a devious scheme, wherein he directed clients to endorse their checks directly to him. The money thus received by the petitioner was deposited into his personal account and converted, some of the money being used to set up a pension fund for petitioner. This course of conduct continued for a number of years until [petitioner] was caught by a partner at the firm. At that time, [petitioner] *admitted*

stealing $40,000, although we will never know the exact amount that was involved.[1]

Although petitioner had begun to make restitution, after pleading guilty to theft by deception, he was sentenced to 11 and 1/2 months to 23 months in prison, a fine of $2,000 and the payment of restitution and costs. [Petitioner] actually served 11 1/2 months.

The majority correctly sets forth the analysis necessarily applied in this or any case where a disbarred lawyer seeks reinstatement. "Whether the magnitude of the breach of trust would permit the resumption of the practice without a detrimental effect upon 'the integrity and standing of the bar or the administration of justice nor subversive of the public interest.' "[2] And, whether the petitioner has the moral qualifications, competency and learning in the law required to be eligible for reinstatement.[3]

In applying *Keller, supra,* our board has made it clear that

"[s]ome offenses may be of such an egregious nature that no amount of time can dissipate the adverse effect reinstatement of an offending attorney might have upon the standing and integrity of the bar. Thus, the court distinguished a disbarment from a five-year suspension in that although both involve a minimum five-year prohibition from the practice of law, disbarment carries

---

1. One of the confusing aspects of this case is determining the exact amount of money [petitioner] stole. When confronted by a partner, he admitted to stealing $40,000. He pleaded guilty to taking $54,398.02 and has made restitution in the amount of $76,923.14.

2. *Office of Disciplinary Counsel v. Keller, supra* at 579, 506 A.2d at 875.

3. See Pennsylvania Rules of Disciplinary Enforcement 218(c)(3)(i).

with it an air of finality which requires reexamination of the offensive conduct before any consideration may be given to petitioner's plea to regain the privilege to practice law."[4]

My dissent rests on the conclusion that the breach of trust committed by the petitioner in this case is too serious to permit his reinstatement at this time without further injury to the integrity and standing of the bar and the public perception and confidence in our system. I am not suggesting that the petitioner's reinstatement be forever foreclosed. The petitioner has been disbarred for seven years. There is no magic formula that stipulates how much time is sufficient. Clearly, as *Keller* has taught in some cases no amount of time is sufficient. Given the serious breach of trust committed by the petitioner, the impossibility of determining the exact amount of money taken, the fact that a court imposed a stiff sentence after partial restitution had been made and the necessity for our profession to make a statement that stealing by lawyers is intolerable, I believe petitioner's reinstatement would be premature. The public interest and the interest in maintaining the integrity of the bar will not be served by petitioner's reinstatement. In fact, on the record in this case, the only interest served by reinstatement would be petitioner's.

Even though my analysis need not go further, I believe that petitioner fails to meet the requirements of Pa. R.D.E. 218(c)(3)(i). As noted above, the exact amount of money [petitioner] stole is unknown. I am not convinced that petitioner's lack of certainty on this point is merely inattentiveness. Of the same ilk, and more disturbing to me is the non-explanation of the source of the funds used for restitution. I am also troubled

---

4. *In re Anonymous, 4 D.B. 76 at 4, no. 113 (1988).*

that the petitioner suggests one of the reasons he stole from his firm is because his first wife had cancer and required expensive medical treatment. The clear implication is that petitioner's affection for his wife partially caused his transgression. Later, [petitioner] suggests that he experienced marital problems which motivated, in part, his offense. This board is left to determine whether his love for his first wife, or the problems experienced in that marriage, or perhaps both situations, at different times, influenced him to steal.

Finally, I applaud the fact that through counseling, petitioner has learned how to deal with stress and problems. I note that many lawyers and other professionals deal with stress and career disappointment and seek guidance without first stealing money from their employer.

## CONCLUSION

For the reasons stated above, I respectfully dissent from the board's recommendation and recommend that this Honorable Court deny the petition for reinstatement.

## ORDER

And now, July 21, 1993, a rule having been issued upon [petitioner] on April 29, 1993, to show cause why an order denying reinstatement should not be entered, upon consideration of the response filed, the rule is made absolute and the petition for reinstatement is hereby denied. Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the disciplinary board in the investigation and processing of the petition for reinstatement.

Messrs. Justice Zappala, Cappy and Montemuro dissenting would grant reinstatement.