**In re Anonymous No. 47 D.B. 83**

Disciplinary Board Docket no. 47 D.B. 83.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

LEONARD, *Member,* December 28, 1994—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above-captioned petition for reinstatement.

## I. HISTORY OF PROCEEDINGS

Petitioner was disbarred on consent by order of the Supreme Court dated September 1, 1983.

Petitioner filed a petition for reinstatement on July 30, 1993.

On August 3, 1993 the matter was referred to Hearing Committee [    ] consisting of [     ], Chairperson, [    ], and [    ].

A hearing on the petition was scheduled for January 27, 1994 but was postponed. It was postponed at the request of petitioner due to inclement weather. A hearing on the petition was held on March 22, 1994. On May 6, 1994, petitioner submitted findings of facts and conclusions of law to the Hearing Committee. Two weeks later a letter brief was filed on behalf of the Office of Disciplinary Counsel with the Hearing Committee.

The Hearing Committee filed its report on July 26, 1994 recommending petitioner's reinstatement to active status. Neither party filed exceptions to the Hearing Committee report.

The matter was adjudicated at the September 29, 1994 meeting of the board.

## II. FINDINGS OF FACT

(1) Petitioner, [    ], is 56 years of age, graduated from [    ] High School in 1955, obtained a Bachelor of Science Degree from the [    ] University in 1959 and graduated from [    ] University School of Law in 1962. (N.T. 126.)

(2) [Petitioner] was admitted to the practice of law in Pennsylvania in 1962 and began his practice with his father [A], Esquire, with whom he was associated until [A] passed away in 1975.

(3) In the 1960s [petitioner] was actively involved with the [B] Society and helped establish the [C] in 1962. In 1969 he was involved with the organization and start up of [D], a multi-faceted social agency, staffed by volunteers, which provided assistance to the disenfranchised children. (N.T. 128.)

(4) After the suicide of [E], second wife, [petitioner], although devastated, did not seek psychiatric help but began to use drugs, particularly cocaine and alcohol, in increasing amounts. Prior to his wife's death, [petitioner] was an occasional user of marijuana and, less frequently, other drugs. (N.T. 128-130.)

(5) At the time his use of drugs began to escalate, [petitioner] was consumed with guilt over the suicide of his wife, felt adrift and unable to control himself. The drug use continued until [petitioner] became drug dependent and began smoking cocaine. (N.T. 130-131.)

(6) On March 31, 1983 and April 4, 1983 [petitioner] entered into pleas of guilty to 21 U.S.C. §843(b)—use of a communications facility to facilitate narcotic distribution and was sentenced on October 24, 1983 to four years probation, consecutive to incarceration and 21 U.S.C. §846—conspiracy to distribute narcotics and was sentenced on October 24, 1983 to imprisonment of five years. The court, in an addendum, found that [petitioner] acted, not for profit, but to obtain drugs for personal use. (N.T. 46, 48-51.)

(7) The first criminal charge was the result of [petitioner] obtaining three grams of cocaine from his supplier and making a telephone call to his female companion indicating that he was returning home with drugs. The second criminal charge stemmed from [petitioner's] presence at a drug deal between other individuals, where [petitioner] intended to buy drugs for personal use, and being present in the automobile when the driver fled

the scene. [Petitioner], when handed the cocaine, threw the bag out of the car. (N.T. 132.)

(8) In April 1984, [petitioner] surrendered to the Federal Prison Camp at [F]. (N.T. 135.)

(9) While at FPC [F] [petitioner] participated in an AA-Self Help Group which proved a valuable aid to [petitioner] in maintaining his stability during incarceration. (N.T. 137.)

(10) [Petitioner] testified that going to jail probably saved his life and, while in jail, he regained his health. (N.T. 135-136.)

(11) On September 4, 1985 [petitioner] was transferred to the [G] Halfway House, [    ], [    ] and was released from this facility on December 22, 1985. (N.T. 137.)

(12) [Petitioner] received early termination from probation on June 8, 1988, originally ordered to run through December 20, 1989. [Petitioner's] parole was terminated early on March 8, 1988 originally scheduled to expire March 22, 1989 based upon a finding of the U.S. Parole Commission that [petitioner] would not again engage in conduct which would violate any criminal law. (N.T. 141.)

(13) During the course of [petitioner's] incarceration, probation and parole there were no incidents of misconduct. (N.T. 140.)

(14) It was after [petitioner's] transfer to the [G] Halfway House in [    ] that he became involved in a recovery program for addicted lawyers, supervised by [H], Esquire and continues to attend the weekly meetings with fair regularity. (N.T. 11, 12, 18.)

(15) [Petitioner] submitted his resignation statement and was disbarred by consent by order of the Pennsylvania Supreme Court entered September 1, 1983.

More than 10 years have passed since [petitioner's] disbarment. (N.T. 142.)

(16) Although entitled to apply for reinstatement to the bar five years following the order of disbarment [petitioner] chose to wait in order to assure himself that he was ready to practice law in accordance with the higher standards of commitment and responsibility to the public, an honor he took very seriously. (N.T. 142-143.)

(17) [Petitioner] reflects upon his situation almost daily and fully and unequivocally accepts his situation as his sole responsibility. (N.T. 144.)

(18) [Petitioner] expressed shame and remorse for the harm his conduct caused to the image of the legal profession. (N.T. 144.)

(19) [Petitioner] has maintained his knowledge of the law by regularly reading the Criminal Law Reporter, the Criminal Practice Digest, the Federal Reporter, the Atlantic Reporter and the *Legal Intelligencer.* (N.T. 145.)

(20) [Petitioner] has taken three PBI legal practice courses, attending these courses at [    ] University in 1988, [    ] University in 1990 and [    ] University in 1992. Proper and satisfactory evidence of [petitioner's] attendance was submitted. (N.T. 146.)

(21) Upon disbarment [petitioner] submitted a statement of compliance with the rules governing disbarment to the Disciplinary Board. (N.T. 147.)

(22) [Petitioner] submitted to the Office of Disciplinary Counsel tax returns for the years 1990, 1991 and 1992. (N.T. 147.)

(23) [Petitioner] has compromised outstanding tax liens with the Internal Revenue Service, refinanced his home, paying $51,000 recently and owes an additional amount which is contained in the petition for com-

promise with a payment schedule up to 1998 and he is in compliance with the payment schedule and his taxes are current. (N.T. 148.)

(24) [Petitioner] testified that he believes he possesses the moral qualification to resume the practice of law and stated he would never get into trouble again if readmitted. (N.T. 150.)

(25) [Petitioner] continues to participate in the [I] Program and is active in that program. (N.T. 151.)

(26) Additionally, on an irregular basis, [petitioner] has attended programs at [ ], [ ], and [ ] as well as locally in [ ] although his home meeting is the [I] Program. (N.T. 151.)

(27) [Petitioner] testified that it was not the stress of the practice of law which occasioned his drug dependence as he had practiced without incident since November of 1962 but, rather, the suicide of his wife, the pressures of raising a 1 year old daughter, feelings of guilt, lack of self-confidence and loss which occasioned the drug usage and ultimate drug dependence. (N.T. 130-131, 152.)

(28) [J], M.D., a practicing psychiatrist since 1965, testified that he has known [petitioner] since approximately 1959. (N.T. 109.)

(29) In approximately 1981 or 1982 Dr. [J] began to see [petitioner] with respect to his depression, feelings of self-worthlessness, drug addiction, distress over his second wife's suicide and her mental illness as well as his feelings of helplessness attendant to caring for a young child. (N.T. 109-110.)

(30) Dr. [J] testified that he provided psychiatric testimony at [petitioner's] sentencing and has seen [petitioner] professionally subsequent to his release from jail. (N.T. 111.)

(31) The problems for which Dr. [J] afforded treatment to [petitioner] included depression, stress and substance abuse. Dr. [J] testified that self-medication in an effort to deal with emotional difficulties resulting in addiction is not uncommon. (N.T. 111.)

(32) Dr. [J] testified that [petitioner] was a physical wreck prior to incarceration, however upon his release he looked much better and was obviously no longer involved with drugs. (N.T. 113.)

(33) Dr. [J] continues to see [petitioner] as a physician on an as needed basis. (N.T. 114.)

(34) Dr. [J], in both his professional and personal contacts with [petitioner], has observed no indication of drug or alcohol abuse. Further, Dr. [J] testified that [petitioner] continues to attend a recovery program. (N.T. 115.)

(35) Dr. [J] testified that [petitioner] is able to cope, personally and professionally, with stresses without resorting to substance abuse or adopting addictive approach. (N.T. 115-116.)

(36) Dr. [J] testified that, in his opinion, [petitioner] possesses the moral qualifications for readmission to the practice of law. (N.T. 118.)

(37) Dr. [J] rendered his professional opinion that it is unlikely [petitioner] would return to self-medication if presented with a stressful situation. (N.T. 122.)

(38) [H], Esquire, a member of the Bar of the Supreme Court of Pennsylvania, who has known [petitioner] for approximately 25 years, testified that [petitioner] had participated in a recovery program while in prison and continued, upon release, a 12 step program for lawyers who are addicted to alcohol or drugs, in which he is still participating. [Petitioner] has always helped out with the program, and always says yes whenever asked

to do something and is deserving of a lot of credit for that. (N.T. 11-14.)

(39) When the lawyers' recovery group undertook a program to help addicts who were on state and federal probation as part of a job training program at the [K] factory of the United States Probation Department, [petitioner] was asked to help out and for months, single-handedly ran the program. (N.T. 13.)

(40) [H] opined that [petitioner] is committed to remaining sober and has the humility to accomplish that task. [H] expressed the opinion that [petitioner] would be a blessing to the Bar of the Supreme Court of Pennsylvania. (N.T. 15.)

(41) [L], Esquire, a member of the Bar of the Supreme Court of Pennsylvania since 1965, testified that he has known [petitioner] since 1976 and in terms of his competence to practice law, [petitioner] was above average. (N.T. 31.)

(42) [L] testified that he is [petitioner's] sponsor at the [I] Program. A sponsor/sponsoree is a special relationship which includes guidance, frequent communication, experience sharing, strength and hope. (N.T. 33.)

(43) [L] testified that [petitioner] has been continuously sober in the program. (N.T. 34.)

(44) [L] testified that [petitioner's] commitment to sobriety is based upon an honesty with himself and others, attitude of humility, surrender and acceptance and in providing help to others as well as accepting a total abstinence from drugs and alcohol as his lifestyle. Exemplifying these ideals is [petitioner's] participation in the [K] Program, [M] Program, transporting individuals to and from meetings and consistently offering his assistance to others. (N.T. 34-35.)

(45) [L] testified that the resumption of practice of law by [petitioner] would not be detrimental to the integrity and standing of the bar, the administration of justice or the public interest, that [petitioner] is a highly competent attorney who is healed and can take up the responsibilities of being an attorney. (N.T. 37-38.)

(46) [L] testified that a reoccurrence of addiction in [petitioner] is not likely due to the pressure of practicing law as that did not seem to be a problem prior to his wife's suicide. (N.T. 42.)

(47) [N], Esquire, testified that he has been a member of the Bar of the Supreme Court of Pennsylvania since 1958 and his practice is mostly federal criminal defense. He is presently editor of the [O] and has been a contributor since 1974. (N.T. 43-44.)

(48) [N's] reputation, prior to disbarment, was that he was the pre-eminent drug lawyer in the [  ] area. He had a national reputation as a criminal defense lawyer in that field at that time. He was an expert on search and seizure and on appellate work. (N.T. 45.)

(49) [N] represented [petitioner] in the criminal matters that led to his resignation and disbarment on consent.

(50) [N] identified a document dated April 10, 1984 as an addendum to modify presentence report dated February 9, 1984. The document admitted as an exhibit stated:

"At the hearing held before the court on April 4, 1984, on defendant's motion to reconsider sentence previously imposed, the court considered specifically the concluding paragraph of the probation report dated February 9, 1984 and especially advised that in imposing sentence the court neither assumed nor believed that the defendant attempted to profit financially by brokering drug deals. Rather, he used his contact and his

'deals' 'so-called,' solely for the purpose of acquiring drugs for his own personal use and to assuage his own needs.

"As directed by Judge [P].

"Respectfully submitted [Q], Chief United States Probation Officer, by [R], United States Probation Officer."

This was important to [petitioner], the court, and the United States Parole Board. [N] confirmed the facts in the addendum. (N.T. 50-51.)

(51) After [petitioner's] release from incarceration to a halfway house, he became an employee of [N's] law firm as a legal assistant and his work product is excellent. (N.T. 54.)

(52) [N] testified to [petitioner's] continued sobriety since release from prison in 1985.

(53) At work, [petitioner] clearly identifies himself as a non-lawyer, explains that he was an attorney, got in trouble, was incarcerated, and is no longer an attorney. (N.T. 58.)

(54) [N] testified that, in his opinion, [petitioner] has the competency and moral qualifications to resume the practice of law and the bar needs all the good lawyers it can get. His readmission would not be detrimental to the integrity of the bar, the administration of justice or the public interest. [N] further testified that [petitioner's] reputation is consistent with his opinion. (N.T. 62.)

(55) [S] a former judge of the Court of Common Pleas of [    ] County, testified that when he met [petitioner] in approximately 1966, while an assistant district attorney, [petitioner] was an excellent lawyer. This opinion continued through Judge [S's] tenure as a [    ] court and common pleas judge. [Petitioner] was always prepared and knowledgeable. (N.T. 21-22.)

(56) Judge [S] has had the opportunity to observe [petitioner] at work and discuss [petitioner] with other members of the bar and community and testified that [petitioner] possesses the moral qualifications for readmission to the practice of law and that the resumption of the practice of law by [petitioner] would not be detrimental to the integrity and standing of the bar, the administration of justice or the public interest. (N.T. 25-26.)

(57) [T], Esquire, chairman of the [U] Committee of the [    ] Bar Association and who has been actively involved with the correctional system, drafting of drug laws designated as Act 63 and Act 64, the creation of the Governor's Drug and Alcohol Counsel as well as holding other positions in the public domain testified that he has known [petitioner] for approximately 42 years when they were classmates at [    ] High School. (N.T. 86-87.)

(58) [T] testified that [petitioner] was co-founder of a volunteer organization called [D] Inc. which provided free legal and other services for youth in the late 1960s through early 1970s. [Petitioner] was frequently on duty for emergencies 24 hours a day. [D] initiated and supervised the original pretrial probation program (now A.R.D. Pa.R.C.P. 170 et. seq.) begun by then District Attorney [V] and Deputy District Attorney [W], Esquire. The volunteers served for free until the program was funded by a federal grant. Many of [D's] functions were later merged with the [    ] Probation Department. (N.T. 88-90.)

(59) [Petitioner] served as both chairman and member of the Board of Directors of [D] Inc. (N.T. 90.)

(60) Since his release from incarceration, [T] and [petitioner] have become reacquainted on a close basis. As a result of that relationship he has observed [pe-

titioner] make a positive transition to a clean and sober life. (N.T. 91-92.) [T] testified that [petitioner] is of the highest moral character and he has absolutely no doubt that [petitioner] has led a clean and sober life. [Petitioner's] resumption of the practice of law would be a welcome addition to the bar and would not be detrimental to the administration of justice or public interest. (N.T. 95.)

(61) [T], a drafter of the [X] Act which recognized drug abuse and alcohol abuse as a disease testified [petitioner] has overcome his addiction at this time. (N.T. 96.)

(62) [Y], a member of the Bar of the Supreme Court of Pennsylvania, a member of the [ ] Committee for the [ ] Bar Association, and director of the [ ] Association of [ ] testified that she became acquainted with [petitioner] in 1982. [Y] described [petitioner], at that time, as a mess. She again became reacquainted with [petitioner] after his employment in the offices of [N] with whom she is associated. She describes [petitioner] as completely different, having turned his life around. (N.T. 60.)

(63) [Y] testified that [petitioner] is an asset to the law office as a legal assistant, and described [petitioner] as extremely hard working. [Y] testified that [petitioner] possesses the moral qualifications for readmission to the practice of law and gave an opinion that his resumption of the practice of law would not be detrimental to the administration of justice, the public interest or the integrity and standing of the bar. [Y] further testified that [petitioner's] reputation is excellent. (N.T. 67.)

(64) [Z], Esquire, a member of the Bar of the Supreme Court of Pennsylvania for 18 years testified that [petitioner], before he went to prison, was an extremely brilliant attorney, who was a somewhat unlikable and

unreliable person. Prior to [petitioner] going to prison, [petitioner] appeared to [Z] as a man on the point of death. (N.T. 97-98.)

(65) [Z] testified that [petitioner] is now an extremely reliable individual who he has contact with on a daily basis and the quality of [petitioner's] work product is consistently high.

(66) [Z] testified that [petitioner] possesses the moral qualifications to resume the practice of law and would be an asset to the integrity and standing of the bar. (N.T. 100.)

(67) [AA], Esquire, a member of the Bar of the Supreme Court of Pennsylvania since 1981 testified that he is a member of the firm of [N] and Associates and as such, has used [petitioner's] services such as brief writing etc. and [petitioner] does a terrific job. (N.T. 102.)

(68) In particular, [AA] testified that [petitioner's] interaction with and dedication to his family is most commendable. (N.T. 103.)

(69) [AA] testified that [petitioner] has the competency and moral qualifications to resume the practice of law and the resumption would not be detrimental to the integrity and standing of the bar nor the administration of justice or the public interest. (N.T. 105.)

(70) [BB], a member of the Bar of the Supreme Court of Pennsylvania, testified that his first legal employment was with [petitioner] whom he described as a superb teacher who was never too busy to explain what he was doing and why. (N.T. 168.)

(71) [BB] described [petitioner] as extremely competent, very bright and hard working who worked as diligently for people that could not pay as well as for people who did. (N.T. 169.)

(72) [BB] describes [petitioner] as a devoted father who still works very hard and still has time to advise [BB] and answer questions for him. (N.T. 170.)

(73) [BB] expressed an opinion that [petitioner] morally, ethically and competently has the qualifications for readmission to the practice of law and his readmission would be a credit to the bar. (N.T. 171.)

(74) [CC], a member of the Bar of the Supreme Court of Pennsylvania and former chair of the [    ] Section of the [    ] Bar Association testified that she met [petitioner] in 1986 but had read about him before in a publication about the best lawyers in the United States in the field of drug defense. (N.T. 173.)

(75) [CC] testified that when she received her first court appointment on a drug case she contacted [petitioner] who invited her to his office and advised her on the case's management, use of a trial notebook and organization of her file as well as techniques and cross-examination. His assistance was given willingly and without hesitation. He advised her as to the proper attitude to adopt when representing a client charged with rape, a situation with which she was uncomfortable. (N.T. 174-175.)

(76) [CC] opined that [petitioner] is competent in the law and would be a contributing and positive influence if readmitted to the bar. (N.T. 176.)

(77) [DD], retired budget analyst for the U.S. government, president of the [B] Society and member of the [    ] Association testified that he has been associated with the [B] Society since 1958, president for four years and treasurer for six years.

(78) [DD] testified that the [B] Society is a non-profit educational corporation which gives grants, scholarships, and performs other community services with the

funds it received from a [C] which has been put on every year for 33 years by volunteers.

(79) [DD] testified that [petitioner] has been an active volunteer with the society since its inception and was a board member, and legal counsel, without compensation. Except for the time he was suffering from his drug problem, he has always been a volunteer. (N.T. 76.)

(80) [DD] believes that [petitioner] possesses the moral qualifications to be admitted to the practice of law and as a member the public does not believe that the resumption of the practice of law by [petitioner] would, in any way, be subversive to the public interest. (N.T. 78.)

(81) [EE] testified that he is the former criminal investigator for the Department of [    ], Office of the [    ], now retired, and chairman and chief executive officer of the [C]. (N.T. 79.)

(82) [EE] testified that [petitioner] was active in the incorporation of the [B] Society as a non-profit educational entity in 1964 with the result that the [B] Society has worked extensively in presenting educational programs in the public school system and performing at old age homes and senior citizen centers. Further, the society has secured grants and provided scholarships at several high schools, as well as the University of [    ], which includes funding the Department of [    ].

(83) [EE] testified [petitioner's] commitment as a volunteer is excellent.

(84) [EE] recounted [petitioner's] devotion to a mutual friend, an incapacitated double amputee, [FF], as exemplified by [petitioner's] assistance to [FF] in shopping, socializing and re-establishing his life. (N.T. 83.)

(85) [EE] testified that he believed [petitioner] was highly qualified to resume the practice of law and knew of nothing that would be detrimental to the public interest in [petitioner's] resuming the practice of law as he found [petitioner] to be honest, straightforward and a gentleman. (N.T. 84.)

(86) [GG], Ph.D., a psychologist, testified that he has known [petitioner] for 25 years and was an early volunteer for [D] Inc. [GG], the first director of the [    ] Program, testified that [petitioner], at that time, was a rare combination of a person of high ethics and a very sharp legal mind. (N.T. 163.)

(87) [GG] testified that [petitioner's] resumption of the practice of law would be to the public's advantage as [petitioner] is a person of high moral standards who has paid his debt to society. (N.T. 165.)

(88) [HH], founder and administrator of the [    ] Academy of [    ], [    ], [    ] and wife of an attorney, testified.

(89) [HH] testified that [petitioner's] daughter, [II], attended her school from age 4 through sixth grade except for a brief period. Although not very involved in his daughter's education initially, [petitioner's] involvement grew and grew. For example, when [HH] identified a problem with the home environment, [petitioner] immediately sent his daughter to live with his brother in [    ]. (N.T. 156-157.)

(90) [Petitioner's] daughter returned and attended from first through sixth grade. At that time [HH] testified [petitioner] was very, very involved and committed to his daughter's education. As a single parent, he ably filled the roles of mother and father and accepted advice. [HH] noticed the positive growth in this child to a young woman which she attributed to [petitioner]. [Petitioner] assisted on field trips and obtained musicians

for the school. The entire staff of the school is supportive of [petitioner's] reinstatement to the practice of law. (N.T. 158-159.)

(91) [HH], whose husband is a senior partner in an [    ] law firm, has a very strong opinion that [petitioner] has the moral qualifications for readmission to the bar. As a member of the public she believes that [petitioner] would be beneficial to the bar if reinstated and as a member of the public did not feel that [petitioner's] reinstatement would be detrimental to the standing and integrity of the bar or the public interest. (N.T. 160.)

(92) [JJ], Esquire, the Assistant United States Attorney who prosecuted [petitioner] testified by letter that she knows no reason why he should not be permitted to resume the practice of law and believes he meets the criteria outlined for readmission.

(93) [Petitioner] received character letters from numerous persons including [KK], Esquire, the former president of the [    ], Professor [LL], Esquire of [    ] University School of Law, [MM], Esquire, [NN], Esquire, who unhesitatingly endorsed [petitioner's] petition for reinstatement.

(94) [Petitioner] has had appropriate employment since his release from incarceration with the office of [N] as a legal assistant and there is no evidence that his employment involves the unauthorized practice of law.

(95) Throughout his legal career, including during his period of disbarment, [petitioner] has continued to be of assistance and guidance to younger lawyers without hesitation.

(96) Throughout his legal career, including during his period of disbarment, [petitioner] has continued to serve his community in volunteer endeavors.

(97) [Petitioner's] misconduct did not involve misuse of client funds, lying to the court, submission of false documents but was a by-product of his drug and alcohol addiction.

(98) [Petitioner] voluntarily submitted a resignation statement.

## III. DISCUSSION

Petitioner has requested reinstatement from disbarment on consent by order of the Supreme Court of Pennsylvania entered September 1, 1983. Petitioner voluntarily submitted a statement of resignation prior to entering a plea of guilty to the offense of conspiracy to distribute narcotics, 21 U.S.C. §846, one count and the use of a communications facility to facilitate narcotic distribution, 21 U.S.C. §843(b), one count.

Before evaluating whether petitioner has met his burden of proof outlined in Pa.R.D.E. 218(c)(3)(i) the Disciplinary Board of the Supreme Court of Pennsylvania must determine whether petitioner's misconduct, which led to the disbarment, was so egregious as to automatically preclude readmission. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986).

For many years prior to his drug addiction petitioner successfully practiced law and was well respected by the members of the criminal defense bar. Personal tragedy, the suicide of his second wife, led him to excessive, compulsive drug use resulting in addiction. Although petitioner pled guilty to two drug-related offenses the court issued an addendum to modify its presentence report specifically recognizing that his criminal activity was not for financial gain but merely to secure drugs for his personal use. Petitioner's misconduct did not involve dishonesty, fraud or misrepresentation to his clients or the court but arose from his drug and alcohol

addiction. Testimony of petitioner's friends and professional colleagues, all of whom were credible, confirms that this period of petitioner's life was an aberration.

*In re Anonymous No. 45 D.B. 84,* 15 D.&C.4th 321 (1992), the Disciplinary Board of the Supreme Court of Pennsylvania recommended reinstatement following disbarment due to petitioner's conviction of one count of knowingly conspiring to unlawfully import, distribute and possess with intent to distribute four ounces of cocaine in violation of 21 U.S.C. §841(a)(1). Similar to the petitioner in that case, [petitioner's] conduct was an aberrational response to an exceptionally traumatic personal event. Before succumbing to addiction [petitioner] was a respected, competent attorney and member of the community.

Consistent with the Disciplinary Board's analysis in *In re Anonymous No. 45 D.B. 84, supra,* the Disciplinary Board of the Supreme Court of Pennsylvania concludes that petitioner's conduct was aberrational, is unlikely to be repeated and does not constitute an act of misconduct so repugnant to the integrity of the bar and the interest of the public that, by its very nature, precludes rehabilitation. The Disciplinary Board of the Supreme Court of Pennsylvania finds that petitioner has met the *Keller* standard.

In seeking reinstatement petitioner must prove, by clear and convincing evidence, that he has the moral qualifications, competency and learning in the law required for admission to practice in the Commonwealth of Pennsylvania and that the resumption of the practice of law will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest. Pa.R.D.E., 218.

In assessing a petitioner's "moral qualifications" the Pennsylvania Supreme Court requires a review of the

sensitive aspects of the individual's personal life and a consideration of all charges or rumors of impropriety. *Philadelphia Newspapers Inc. v. Disciplinary Board of the Supreme Court,* 468 Pa. 382, 363 A.2d 779 (1976).

The improprieties which reflect upon petitioner's moral fitness to engage in the practice of law stem entirely from his drug addiction which he developed as a means of coping with the suicide of his wife. Without exception the testimony clearly and convincingly revealed petitioner as a competent hard working individual who gave freely of his time and energy to his family and community. The credible evidence supported petitioner's testimony that he has been sober for over 10 years. Consequently, the Disciplinary Board of the Supreme Court of Pennsylvania concludes that [petitioner] has the moral fitness to engage in the practice of law.

In requesting reinstatement the Pennsylvania Rules of Disciplinary Enforcement merely direct that a disbarred attorney may not seek reinstatement prior to the expiration of five years from the effective date of disbarment. Pa.R.D.E., 218(b). Petitioner was disbarred over 10 years ago. He did not request reinstatement as he wishes to assure himself that he could perform in a manner compatible with the highest standards of the legal profession. The evidence indicates that [petitioner] has diligently worked to achieve this goal and the Disciplinary Board of the Supreme Court of Pennsylvania finds that petitioner is rehabilitated.

The Disciplinary Board of the Supreme Court of Pennsylvania finds that petitioner has demonstrated, by clear and convincing evidence, that he possesses the necessary competency and learning in the law necessary to reinstatement. Petitioner has attended three PBI legal practice courses in 1988, 1990 and 1992. He remains

current in the law by reading legal periodicals and has been employed by a law firm since 1985 functioning in a legal assistant capacity.

The credible evidence demonstrates, clearly and convincingly, and the Disciplinary Board of the Supreme Court of Pennsylvania so finds, that petitioner, has the moral qualifications, competency and learning in the law required for admission to practice law in this Commonwealth and that his resumption of the practice of law will be neither detrimental to the integrity and standing of the bar, the administration of justice or subversive to the public interest.

### IV. CONCLUSIONS OF LAW

(1) The misconduct which resulted in petitioner's disbarment is not so egregious as to preclude consideration of his petition for reinstatement.

(2) Petitioner has proved that he possesses the moral qualifications, competency and learning of the law required of an attorney license[d] to practice law in the Commonwealth of Pennsylvania.

(3) Petitioner's resumption of the practice of law will not compromise the integrity of the bar nor subvert the public interest.

(4) The petitioner and all the witnesses were found credible.

### V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that petitioner, [    ], be reinstated to the practice of law.

### ORDER

And now, February 7, 1995, upon consideration of the report and recommendations of the Disciplinary

Board of the Supreme Court of Pennsylvania dated December 28, 1994 the petition for reinstatement is granted.

Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.

Mr. Justice Montemuro is sitting by designation.